67 F.3d 216
 95 Cal. Daily Op. Serv. 7572, 95 Daily Journal
D.A.R. 12,992
Anthony DeWayne MITCHELL also known as Mustafa B. Shabazz,
Plaintiff-Appellee,
v.
Clarence DUPNIK, Sheriff of Pima County, Defendant-Appellant.
Anthony DeWayne MITCHELL, Plaintiff-Appellee,
v.
Clarence DUPNIK, Defendant,
Donald Robare and Michael Garland, Defendants-Appellants.
Anthony DeWayne MITCHELL, Plaintiff-Appellee,
v.
Clarence DUPNIK; David Bosman; and Richard Fimbers,
Defendants-Appellants.
 Nos. 93-16517, 93-16955 and 93-17019.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 14, 1995.
Decided Sept. 28, 1995.
 
 Gerald Maltz, Miller, Pitt and McAnally, Tucson, Arizona, for defendants-appellants.
 Gerard M. Guerin, Deputy County Attorney, Tucson, Arizona, for defendants-appellants.
 Mustafa B. Shabazz, pro per, Florence, Arizona, for plaintiff-appellee.
 Appeals from the United States District Court for the District of Arizona.
 Before: CHOY, CANBY, and T.G. NELSON, Circuit Judges.
 CANBY, Circuit Judge:
 
 
 1
 Pima County Sheriff Clarence Dupnik and several of his deputies appeal a series of district court judgments and orders in favor of prisoner Mustafa B. Shabazz, formerly known as Anthony D. Mitchell, resulting from multiple actions that Shabazz had brought under 42 U.S.C. Sec. 1983. We affirm in part, reverse in part, and remand for further proceedings.
 
 BACKGROUND
 I. Appeal No. 93-16955
 
 2
 Shabazz was held in the Pima County Adult Correction Center ("the Jail") from February 1991, to September 1992, during the pendency of his trial on criminal charges not at issue here. While at the Jail, Shabazz instituted his first action under Sec. 1983 alleging numerous violations of his constitutional rights. The district court later dismissed all but two of the claims.
 
 
 3
 The first of those surviving claims alleged that Donald Robare, a corrections officer at the Jail, violated the Due Process Clause of the Fourteenth Amendment by failing to observe several required procedural safeguards while conducting three separate disciplinary proceedings against Shabazz. Specifically, the complaint alleged that: (1) Robare failed to tape record at least one of the proceedings, in violation of published Jail policy; (2) Robare refused to allow Shabazz to call witnesses at the proceedings, again in contravention of Jail policy; and (3) Robare did not deliver to Shabazz written copies of the findings in each proceeding, which was required by Jail policy. Shabazz contended that the alleged violations resulted in his unjustified assignment to nineteen days of segregation.
 
 
 4
 Robare moved to dismiss the claim, but the court determined that most or all issues were disputed, and instead ordered the Jail to re-conduct the three hearings with the necessary safeguards in place and to resentence Shabazz accordingly. After rehearing, Shabazz received seven fewer days in segregation than in his original sentence. Because Shabazz had already served the longer sentence, no additional segregation was warranted. Upon Shabazz' motion, the district court granted summary judgment on the issue of Robare's liability and set trial for damages.
 
 
 5
 Shabazz' second surviving claim alleged that Michael Garland, also a corrections officer at the Jail, interfered with a constitutionally protected liberty interest by searching Shabazz' legal papers while he was not present, in knowing violation of published Jail policy. Upon Shabazz' motion, the court also granted summary judgment against Garland on the issue of liability and set a trial to determine damages.
 
 
 6
 After separate trials, the district court entered judgments awarding Shabazz $1000 in damages against Robare and $550 in damages against Garland, in their individual capacities.
 
 II. Appeal No. 93-17019
 
 7
 While Shabazz was incarcerated in the Jail, he apparently was often disruptive, and as a result he spent significant time in the "administrative segregation" wing of the Jail. Inmates are generally moved to administrative segregation because they present a risk to safety or discipline. While there, by necessity they enjoy fewer privileges than the general Jail population.
 
 
 8
 While still at the Jail, Shabazz filed a second action under section 1983 against Sheriff Dupnik, Major David Bosman, the Jail's corrections commander, Richard Fimbers, the Supervisor of Discipline at the Jail, and six other sheriff's deputies. The complaint alleged nine separate constitutional violations, all dealing with the disciplinary system in the administrative segregation wing. On defendants' motion, the court ultimately dismissed all but two claims, against Dupnik, Bosman and Fimbers collectively ("the Sheriff").
 
 
 9
 Shabazz' first claim alleged that the Sheriff's de facto policy denying inmates the right to call and examine witnesses during their disciplinary hearings violated due process. In his second claim, Shabazz alleged that the Sheriff deprived him of a protected liberty interest without due process by failing to provide him, after his hearings were completed, with copies of the disciplinary committee's findings indicating whether an impartial reviewing staff member concurred in the findings.
 
 
 10
 Shabazz moved for and was granted summary judgment on the issue of liability as to all three defendants on both claims. After a bench trial on the issue of damages accruing from the first claim, the district court awarded Shabazz $4,500 in compensatory damages and $100,000 in punitive damages against the three in their official capacities.[1] On the second claim, the court awarded Shabazz $250 in compensatory damages against each defendant in his individual capacity.
 
 III. Appeal No. 93-16517
 
 11
 As we noted above, Shabazz was held in the Jail when he instituted his Sec. 1983 actions against the Sheriff and against Robare and Garland, respectively. He prosecuted the actions in propria persona, and thus required use of the Jail's law library facilities, including its reporters and its photocopying services. Shabazz spent significant stretches of time, however, housed in the Jail's administrative segregation wing as a consequence of his disruptive behavior and rule violations. Residents of the wing are not permitted to leave it, and therefore do not have direct access to the Jail's law library.
 
 
 12
 The library serves segregated inmates through a paging system in which the inmates can order up to five legal books twice per week. The paging system is not rigid in that, under "special circumstances," inmates may request and receive in excess of five books at a time. Additionally, a library staff is available on a limited basis to assist with an inmate's legal research.
 
 
 13
 Shabazz moved during the course of his action to compel the Jail to provide greater access to legal materials, photocopying and carbon paper. On July 15, 1992, the district court denied Shabazz' motion, but issued an injunction ordering the Jail to publish its legal access policy, including the process by which it evaluated requests for exceptions to the paging system limits for segregated inmates. Dupnik complied in September of 1992. Also in September, the state moved the now-convicted Shabazz from the Jail to Florence State Correctional Facility to serve his criminal sentence.
 
 
 14
 On October 6, 1992, the district court issued another order finding the Jail's then-recently published policy to be constitutionally inadequate. The policy did not explain the factors that Jail authorities would consider in determining whether to grant exceptions to book and delivery time limits for segregated inmates. The court again ordered the Jail to publish a satisfactory policy.[2] After an evidentiary hearing, the district court on March 17, 1993, issued its final order finding the Jail's second attempt at formulating a library access policy to be inadequate. The court cured the inadequacy by writing the Jail's "exceptions" policy itself.
 
 ANALYSIS
 
 15
 I. The Search of Shabazz' Legal Papers.
 
 
 16
 We review de novo a district court's grant of summary judgment. Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Id.
 
 
 17
 The Jail's published policy on cell searches provides that
 
 
 18
 For the security and safety of inmates and staff, we will, on occasion, find it necessary to conduct an unannounced inspection of your pod and assigned cell.... Inmates do not have the right to be present during an inspection of any item except bona fide legal papers.
 
 
 19
 (emphasis added). Shabazz alleged that the above policy created a protected liberty interest in his being present during any search of his legal papers, and that Garland violated this interest by refusing to allow him to be present during such a search. The district court agreed, and granted summary judgment against Garland on the issue of liability. We now reverse.
 
 
 20
 Although an inmate ordinarily has no reasonable expectation of privacy as to his jail cell or his possessions within it, Hudson v. Palmer, 468 U.S. 517, 525-26, 104 S.Ct. 3194, 3199-3200, 82 L.Ed.2d 393 (1984), a jail regulation may create a constitutionally protected liberty interest related to those possessions. See, e.g., Olim v. Wakinekona, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983). Our approach to determining whether such a liberty interest has been created, however, has recently changed.
 
 
 21
 Our prior cases held that a state prison regulation created a liberty interest only when it "contain[ed] 'substantive predicates' governing an official's decision regarding a matter directly related to the individual," and when it used " 'explicitly mandatory language' specifying the outcome that must be reached upon a finding that the substantive predicates have been met." Dix v. County of Shasta, 963 F.2d 1296, 1299 (9th Cir.1992) (quoting Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 462-63, 109 S.Ct. 1904, 1909-10, 104 L.Ed.2d 506 (1989)); see also Mujahid v. Meyer, 59 F.3d 931 (9th Cir.1995) (outlining the "substantive predicates" approach and recognizing its supersedure). It was on this approach that the parties based their arguments during the appeal of this issue.
 
 
 22
 The Supreme Court has since adopted a new approach to determining when prison regulations create a liberty interest. In Sandin v. Conner, --- U.S. ----, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the court criticized the substantive predicates approach, noting that by using it, courts had "ceased to examine the 'nature' of the interest" purported to be created by the State, in favor of a mechanical exercise in parsing individual prison regulations to look for magic words:
 
 
 23
 By shifting the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not on the nature of the deprivation, the Court encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges. Courts have, in response, and not altogether illogically, drawn negative inferences from mandatory language in the text of prison regulations ... [W]e believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause.
 
 
 24
 Id. at ---- - ----, 115 S.Ct. at 2298-2300.
 
 
 25
 Sandin consequently refocused the test for determining the existence of a liberty interest away from the wording of prison regulations and toward an examination of the hardship caused by the prison's challenged action relative to "the basic conditions" of life as a prisoner. See id. at ----, 115 S.Ct. at 2300. The Court reformulated the working definition of a liberty interest in the present context to include only "freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. It is under this definition that we analyze Shabazz' claim.
 
 
 26
 Garland concededly violated a Jail regulation that provides for inmates to be present when their legal papers are searched. The prisoner, his cell and all of his other possessions, however, are already subject to inspection at any time and for any or no reason. Thus the inspection of his legal papers is simply not a dramatic departure from the basic conditions of his incarceration. We hold that the violation of this regulation does not "present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." Id. at ----, 115 S.Ct. at 2301.
 
 
 27
 Our holding explicitly recognizes that the Jail's regulation governing the inspection of an inmate's legal papers, as well as myriad other prison regulations elsewhere, are not legally enforceable. We are aware that the inmate now reading his prison's regulations may view them as nothing more than empty promises. But the Supreme Court has held that such regulations are "not designed to confer rights on inmates." Id. at ----, 115 S.Ct. at 2299. The regulations are instead "primarily designed to guide correctional officials in the administration of a prison." Id.
 
 
 28
 Sandin thus requires that we reverse the district court's award of summary judgment against Garland on the issue of liability.
 
 
 29
 II. Tape Recordings of the Disciplinary Hearings.
 
 
 30
 In his claim against Robare, Shabazz alleged that the deputy violated his Fourteenth Amendment right to Due Process in three ways: 1) Robare failed to tape record one of the three disciplinary hearings in issue; 2) Robare did not allow Shabazz to call witnesses at the hearings; and 3) Robare did not deliver to Shabazz written findings of the disciplinary committee for the hearings. Each alleged action violates published Jail policy.
 
 
 31
 The district court ordered rehearings in all three disciplinary matters, with the appropriate safeguards observed. After the rehearing and upon resentencing, Shabazz received seven less days segregation on the same charges. Thereafter, the court granted summary judgment to Shabazz on the issue of Robare's liability for violating Shabazz' due process rights. However, the court did not specify upon which findings it based its judgment. Upon review, we can discern no valid combination of undisputed facts and applicable law upon which the district court could properly grant Shabazz' motion for summary judgment.
 
 
 32
 The court could not base its summary judgment on Robare's failure to allow witnesses or to deliver written findings in Shabazz' hearings, because genuine factual disputes existed in both of those matters. Jesinger, 24 F.3d at 1130. Robare declared that Shabazz never asked to call any witnesses, and that as a matter of habit he delivers written findings from disciplinary hearings to the affected inmates.
 
 
 33
 The only undisputed fact was Robare's admitted failure to tape record one of the three hearings. Although the district court's Order is unclear, its only factually sustainable basis for ordering summary judgment was a conclusion that Robare's undisputed failure to record the one hearing violated the Constitution, and that, but for the violation, Shabazz would not have suffered the additional days of segregation. In this determination of causation, the district court erred.
 
 
 34
 It is unclear to us how a recording of Shabazz' hearing could have led to a shorter sentence. While such a recording would have facilitated later review of the proceedings for error, and thus may be mandated by Due Process requirements, its presence or absence would not affect the fact or duration of punishment initially meted out to Shabazz in the way that, for example, a refusal to allow Shabazz to present exculpatory witnesses or testimony might. The district court admitted that causation on this issue was speculative, and we agree.
 
 
 35
 Viewing all of the evidence in the light most favorable to Robare, as we must, we conclude that the district court erred in finding causation. We reverse the summary judgment against Robare and remand for trial on this claim.
 
 
 36
 III. The Prohibition of Witness Testimony During Disciplinary Proceedings in the Administrative Segregation Wing.
 
 
 37
 The district court applied the relevant substantive law correctly in determining that the Jail's witness policy for disciplinary hearings violated Shabazz' constitutional rights. Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), requires that jail authorities allow an inmate facing disciplinary proceedings to call witnesses in his defense, when permitting him to do so will not be unduly hazardous to institutional safety and correctional concerns. Wolff, 418 U.S. at 566, 94 S.Ct. at 2979. The Jail's published policy on disciplinary hearings appears to comport with Wolff 's requirement. The policy states that an inmate charged with a major rule violation "may call witnesses, but if not practical for safety or security reasons, you may be asked to submit questions you want asked of them. Witnesses may be other inmates or staff members."
 
 
 38
 The district court found, however, that in practice the Jail followed a blanket policy of prohibiting inmates from calling any witnesses under any circumstances to testify at disciplinary hearings. Instead, Jail officials always exercised their option to have the inmate identify his witnesses and pose written questions to them. The officers would then later conduct remote witness interviews, the results of which were incorporated into the material considered by the disciplinary hearing committee when it decided the inmate's case. It is the Sheriff's position that this procedure constitutes the "calling of witnesses," and satisfies Wolff.
 
 
 39
 We have previously held that a blanket denial of permission for an inmate to have witnesses physically present during disciplinary hearings is impermissible, even where jail authorities provide for interviewing of witnesses outside the disciplinary procedure. In Bartholomew v. Watson, 665 F.2d 915 (9th Cir.1982),[3] which involved facts nearly identical to those of the present case, we acknowledged that Wolff does not require jail officials to afford inmates an unrestricted right to call witnesses. Nor does it require officials to state their reasons for refusing to call a witness, although the Court would deem such notice useful. Id. at 918. However, Wolff does require that
 
 
 40
 the decision to preclude the calling of a witness should be made on a case-by-case analysis of the potential hazards which may flow from the calling of a particular person.... A blanket proscription against the calling of certain types of witnesses in all cases involving institutional security is an overreaction which violates minimal due process.
 
 
 41
 Id.
 
 
 42
 The district court found that, despite its written policy, the Jail did not evaluate inmate requests to call witnesses on a case-by-case basis. On the basis of that finding, the court correctly applied Wolff and Bartholomew to conclude that the Jail's de facto policy of not calling witnesses was unconstitutional. The court thus properly granted summary judgment on the issue of the Sheriff's liability for violating Shabazz' rights.
 
 
 43
 Baxter v. Palmigiano, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), from which the Sheriff quotes at length, involves a different issue. The Sheriff relies on language in that opinion concluding that due process does not require a jail to allow an inmate to confront and cross-examine witnesses. Baxter, 425 U.S. at 322-23, 96 S.Ct. at 1559-60. That assertion is undisputed. It is also irrelevant.
 
 
 44
 The witnesses at issue in Baxter, and in the portion of Wolff that Baxter analyzed, were prosecution witnesses, and not the inmate's witnesses. An entirely different balancing of concerns applied to confrontation and cross-examination of these witnesses: greater likelihood of hostility and resentment between the accused and the witness, which would erode discipline and threaten corrective aims; lengthening of the proceedings; and a lesser due process interest for the inmate in confronting these witnesses than in calling his own to provide exculpatory evidence. See Baxter, 425 U.S. at 322-23, 96 S.Ct. at 1559-60; Wolff, 418 U.S. at 561-64, 568-69, 94 S.Ct. at 2977-78, 2980-81. The Baxter court, as well as the Wolff court, determined that on this issue the balance tipped in favor of the prison authorities' concerns for pursuing their safety and correctional goals. Baxter, 425 U.S. at 324, 96 S.Ct. at 1560; Wolff, 418 U.S. at 567-68, 94 S.Ct. at 2980. These concerns, and that balance, do not apply to the present case, in which Shabazz sought to call his own witnesses.
 
 
 45
 IV. Punitive Damages Against Defendants in an Official Capacity.
 
 
 46
 In addition to its grant of compensatory damages in Shabazz' second successful section 1983 action, the district court awarded punitive damages against Dupnik, Bosman and Fimbers in their official capacities in the amount of $100,000. This portion of the award is contrary to law, and we reverse it.
 
 
 47
 Although a municipality may be liable for compensatory damages in Sec. 1983 actions, it is immune from punitive damages under the statute. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981). "A suit against a governmental officer in his official capacity is equivalent to a suit against the governmental entity itself." Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir.1991). The district court's award of $100,000 in punitive damages against Dupnik, Bosman and Fimbers in their official capacities is in reality an assessment against the county, which is immune from such damages.[4] The district court therefore erred in awarding punitive damages.
 
 
 48
 Dupnik also argues, incorrectly, that he is immune from judgment for compensatory damages assessed against him in his official capacity. City of Newport does not save municipalities from liability under Section 1983 for compensatory damages. City of Newport, 453 U.S. at 259, 101 S.Ct. at 2755. That liability extends through Larez to municipal officers, including Dupnik, Bosman and Fimbers. We affirm the district court's award of compensatory damages.
 
 
 49
 V. The Federal Monitor's Findings and the Best Evidence Rule.
 
 
 50
 We review evidentiary rulings for an abuse of discretion, and will not reverse absent some prejudice. Roberts v. College of the Desert, 870 F.2d 1411, 1418 (9th Cir.1988).
 
 
 51
 In previous unrelated litigation, the district court had appointed a Master to review the Jail's procedures and operations for compliance with constitutional and other mandates. The Master had made findings as to the acceptability of the Jail's procedures, including its disciplinary hearing procedures. During trial and on Shabazz' objection, the court excluded some of Fimbers' proposed testimony pertaining to those findings. The court ruled that under Fed.R.Evid. 1002, the best evidence of the Master's evaluation of procedures would be the findings themselves.
 
 
 52
 The court concluded that the testimony was offered to prove the content of the findings, and that the "best evidence rule" should therefore apply. That ruling is defensible. Fimbers asserts, however, that he offered the testimony for a different purpose: to show his good faith in enforcing rules that the Master had not criticized. Good faith, however, is only relevant for purposes of punitive damages.[5] Under Fimbers' theory, the "best evidence rule" would not apply, and the district court erred in excluding evidence under it. In Section IV, however, we determined that defendants are immune from punitive damages in their official capacities, and we reversed the district court's award of those damages. The "best evidence" issue is therefore moot.
 
 
 53
 VI. The October, 1992 and March, 1993 Injunctions and Mootness.
 
 
 54
 The Sheriff argues that Shabazz' claim for injunctive relief pertaining to publication of the Jail's library access policy is moot. We review de novo questions of mootness. Aiona v. Judiciary of State of Hawaii, 17 F.3d 1244, 1246 (9th Cir.1994).
 
 
 55
 The district court's jurisdiction depends of course upon the existence of a live "case or controversy." City of Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). The court has no authority to decide "questions that cannot affect the rights of litigants in the case before [it]." DeFunis v. Odegaard, 416 U.S. 312, 316, 94 S.Ct. 1704, 1705, 40 L.Ed.2d 164 (1974). This case deals with just such a question. Shabazz brought the root action in an individual capacity, and not as the representative of a class of inmates. When he was removed from the Jail, then, any question of the library policy's constitutionality ceased to affect Shabazz' rights, which were the only rights at issue in the action. The issue of the injunction thus ordinarily would be moot.
 
 
 56
 Shabazz argues, however, that the circumstances of his case are "capable of repetition yet evading review," and therefore merit exception from the usual mootness rule. The exception applies when: 1) duration of the challenged conduct is too brief ever to be fully litigated prior to its cessation; and 2) a reasonable expectation is shown that plaintiff will again be subject to the challenged activity. GTE California v. FCC, 39 F.3d 940, 945 (9th Cir.1994).
 
 
 57
 When it issued its Orders, the court noted that the duration of an inmate's stay in the Jail is short, typically only 38 days. Any challenge an inmate might make to the Jail's library access policy would move too slowly through the legal system to reach conclusion in that period. From these facts the court concluded that Shabazz had satisfied the "evading review" prong of the exception's test. Dupnik does not dispute this conclusion.
 
 
 58
 The court also recognized that although Shabazz had been moved to the state prison before it issued either of its last two injunctions, Shabazz was pursuing post-conviction relief, which if granted would necessitate his return to the Jail during pendency of such proceedings and a possible new trial. After considering this information, the court found that there was in fact a reasonable expectation that Shabazz would "again be subject to the challenged library access policy." The court held that the "capable of repetition" prong of the test was also satisfied, and concluded that the issue was not moot.
 
 
 59
 At the time the district court ordered the injunctions, Shabazz' circumstances arguably satisfied the exception's second prong. Those circumstances have changed. The Arizona Court of Appeals has since denied Shabazz' petitions for post-conviction relief. Shabazz' only reason for returning to the Jail no longer exists, and it is clear that he now has no expectation that he will be again subject to the Jail's policies. Because we determine questions of mootness in light of the present circumstances where injunctions are involved, Weinstein v. Bradford, 423 U.S. 147, 148, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975), we conclude that the issue is moot and vacate each of the district court's injunctive orders.
 
 CONCLUSION
 
 60
 We reverse the district court's summary judgment against appellant Robare on the issue of liability for violating Shabazz' civil rights, and remand for trial. We reverse the judgment against appellant Garland.
 
 
 61
 We affirm summary judgment against appellants Dupnik, Bosman and Fimbers on the issue of liability for violation of Shabazz' constitutional rights, but reverse the court's order and judgment for punitive damages against those defendants. We affirm the judgment for compensatory damages. Finally, we vacate as moot the district court's order enjoining the Sheriff to adopt and publish a library access policy.
 
 
 62
 AFFIRMED in part; REVERSED in part; VACATED in part and REMANDED. The parties will bear their own costs on appeal.
 
 
 
 [1]
 The court also ordered, however, that the Sheriff could recoup all punitive damages if he amended Jail policy, practice and training to eliminate the constitutional violations pertaining to the calling of witnesses in inmate disciplinary proceedings
 
 
 [2]
 The October 6, 1992 order was later withdrawn in lieu of an evidentiary hearing on the constitutionality of the Jail's library access policy for segregated inmates
 
 
 [3]
 Appellants' treatment of this case in their "Joint Supplemental Opening Brief" is less than accurate. They attempt to distinguish and dismiss Bartholomew by implying that there, inmates involved in disciplinary hearings could present no testimonial evidence whatsoever, either by calling witnesses in person or by identifying witnesses for outside interview. In Bartholomew, however, as in the present case, the inmates were prohibited from calling live witnesses at the proceeding but were permitted to submit written questions to inmate or staff witnesses. Bartholomew, 665 F.2d at 917-18. We held the prison's policy unconstitutional. Id. at 918
 
 
 [4]
 See also Arizona Revised Statutes Sec. 12-820.04, which provides:
 Punitive and exemplary damages; immunity
 Neither a public entity nor a public employee acting within the scope of his employment is liable for punitive or exemplary damages.
 
 
 [5]
 A jury may award punitive damages under section 1983 "either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." Davis v. Mason County, 927 F.2d 1473, 1485 (9th Cir.), cert. denied, 502 U.S. 899, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991)