William N. SCHENCK, Plaintiff,

v.

Evonne EDWARDS; Pease, Lt.; G. Pierce, Officer; J. Whalen; Tana Wood; Ron Van Boening; Tom Rolfs; Chase Riveland, Defendants.

No. CY–94–3109–LRS.

United States District Court, E.D. Washington.

Feb. 1, 1996.

William N. Schenck, Walla Walla, WA, Pro Se.

Penelope S. Nerup, Asst. Attorney General, Olympia, WA, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, INTER ALIA

SUKO, United States Magistrate Judge.

BEFORE THE COURT are the defendants' motion for summary judgment (Ct. Rec. 55) and defendants' motion to strike (Ct.Rec. 82).

This is a 42 U.S.C. § 1983 action brought by an inmate at the Washington State Penitentiary (WSP). Plaintiff is proceeding pro se. The defendants are represented by Penelope Nerup, Esq., of the Washington State Attorney General's Office.

Plaintiff's action involves three claims: 1) were plaintiff's constitutional rights violated by the confiscation of a draft pleading he prepared for a fellow Washington State Penitentiary (WSP) inmate?; 2) were plaintiff's due process rights violated because he was infracted and found guilty of sending a draft pleading to a fellow inmate?; 3) were plaintiff's constitutional rights violated because of a search of his cell conducted by correctional officers?

These are the only issues before the court pursuant to the order of service (Ct.Rec. 6). Plaintiff attempts to interject other issues into the proceedings at this late date (retaliation, equal protection, etc.), but it is not proper to consider those other matters at this time.

The defendants in this matter include: 1) Evonne Edwards, Mail Machine Operator; 2) Lt. Clifford Pease; 3) Correctional Officer J. Whalen; 4) Correctional Officer G. Pierce; 5) WSP Superintendent Tana Wood; 6) Tom Rolfs, Director of the Division of Prisons (DOP); and 7) Chase Riveland, Secretary of the Department of Corrections (DOC). Plaintiff seeks damages, declaratory relief, and injunctive relief.

## MOTION TO STRIKE

Defendants have filed a motion to strike plaintiff's response to their summary judgment motion on the basis that it is untimely. Plaintiff's response was due December 15, 1995 (Ct.Rec. 76), but was not filed until December 21, 1995 (Ct.Rec. 77).

The court has considered the plaintiff's response. There has been no prejudice to defendants. The defendants have made no attempt to file a reply brief, nor have they

asked for a continuance for that purpose, nor have they asked for a continuance of the summary judgment hearing date beyond January 8, 1996.

The motion to strike is **DENIED.**

## FACTUAL BACKGROUND

There is no dispute as to the vast majority of the facts:

1. On August 15, 1994, plaintiff was charged with two prison rule violations: 1) unauthorized use of the WSP inmate mail system; 2) committing a minor infraction in a serious manner.

2. Plaintiff was charged with these infractions by Mail Machine Operator Evonne Edwards for his attempt to mail legal pleadings he had drafted to inmate Scott Skylstad.

3. Plaintiff received a hearing notice which informed him that his disciplinary hearing would be conducted on August 17, 1994. The notice advised plaintiff that he could request witness statements. (Ex. 1 to Ct.Rec. 58.)

4. The disciplinary hearing was conducted on August 17, 1994 by hearing officer, Lt. Clifford Pease. Certain witness statements were introduced and considered at the hearing. Correctional Officer Partlow returned a witness statement indicating that he had no knowledge of the circumstances surrounding the infractions with which the plaintiff was charged. Lt. Pease determined that it was unnecessary to have the reporting officer (Evonne Edwards) present at the hearing because her involvement was minimal and adequately explained in the infraction report.

5. At the hearing, plaintiff admitted that he had drafted pleadings for inmate Skylstad (a motion for extension of time) and had attempted to mail those pleadings to inmate Skylstad.

6. Plaintiff was found guilty of the infractions charged against him and was sanctioned with ten (10) days of disciplinary segregation, suspended for 180 days. The sanction was never imposed since plaintiff remained infraction-free for 180 days following imposition of the sanction.

7. On August 19, 1994, Lt. Pease ordered Correctional Officers Whalen and Pierce to conduct a search of plaintiff's cell.

8. The officers did not find any documents in plaintiff's cell belonging to inmate Skylstad. However, the officers did find and confiscate certain other legal documents. Those other documents were taken to Lt. Pease for verification and returned to plaintiff immediately after verification that plaintiff and another inmate (Charles Dunnick) were co-plaintiffs in a lawsuit. The documents were held for only a brief period of time in order to verify that plaintiff was not in possession of another inmate's legal materials.

## SUMMARY JUDGMENT STANDARD

Fed.R.Civ.P. 56(c) states that a party is entitled to summary judgment in his favor, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(e) further provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

As the Supreme Court stated in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the

nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.*

Rule 56 does not require the moving party to negate the elements of the nonmoving party's case; to the contrary, "regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. at 2553.

■ In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace the conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. The purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990) (citations omitted).

## DISCUSSION

1. Draft Legal Pleadings—First Amendment

Where the state has provided meaningful alternative access to courts, it may bar writ writers altogether. *Storseth v. Spellman*, 654 F.2d 1349, 1353 (9th Cir.1981) *citing Johnson v. Avery*, 393 U.S. 483, 490, 89 S.Ct.

747, 751, 21 L.Ed.2d 718 (1969). The state retains the authority to impose "reasonable restrictions and restraints upon the acknowledged propensity of prisoners to abuse both the giving and seeking of assistance in the preparation of applications for relief...." *Id. quoting Johnson v. Avery*, 393 U.S. at 490, 89 S.Ct. at 751. In *Storseth*, the Ninth Circuit found that a complete prohibition on inter-institutional correspondence between an inmate writ writer and inmate Storseth impermissibly restricted the First Amendment rights of inmate Storseth. *Id.* at 1355–56.

The Washington State Department of Corrections (DOC) does not bar all forms of inmate assistance. Division of Prisons (DOP) Policy 590.500 (effective December 30, 1993) provides:

1. One inmate may confer with another inmate in the research and preparation of legal pleadings. No inmate may represent another inmate in any matter before a legal tribunal.

2. An inmate assisting another inmate **cannot under any circumstances receive** any form of favor or payment for the time, efforts, equipment or materials used in assisting the other. No fee or consideration may be charged by an inmate who assists another inmate with any legal matter. Any inmate found to be in violation of this directive will be subject to disciplinary action.

3. The Superintendent may limit the time, manner, and place in which one inmate confers with another depending upon security levels, housing assignment, security concerns, and general order of the facility.

4. All personal legal documents and papers must be retained by the party or parties directly involved in the legal matter. Inmates assisting other inmates in the pursuit of legal matters may not retain or possess the other inmate's personal legal documents/papers.

In the instant case, plaintiff Schenck's constitutional claim is not premised on his right to access the courts. That is a claim that would need to be asserted by inmate Skyl-

stad, the inmate whom plaintiff was endeavoring to assist with *his* access to the courts. Furthermore, this court has previously rejected plaintiff's constitutional claim premised on his right to act as a "jailhouse lawyer." That claim was dismissed because of plaintiff's inability to show that inmate Skylstad had suffered an actual injury because of the confiscation of the draft pleading prepared by plaintiff.[1] (See Ct.Rec. 13.)

Rather, plaintiff's First Amendment claim is premised on a theory that plaintiff has a right to correspond with another inmate (a right of free speech and freedom of association) without undue interference from the state. Plaintiff alleges that in this case, the state unduly interfered with his right to correspond with another inmate concerning a particular legal matter.

It does not appear that DOP Policy 509.500 contains an express prohibition on an inmate preparing draft pleadings for another inmate or sending such pleadings to another inmate. Neither, however, does it specifically authorize such activity, even though it does allow inmates to "confer" with another in the research and preparation of legal pleadings. Plaintiff claims that the legal pleading in question was prepared by him and therefore, belonged to him and not to inmate Skylstad. As such, plaintiff claims that he was not possessing the legal documents of another inmate in violation of the policy.

Plaintiff, however, was not charged with possessing legal documents of another inmate.[2] He was charged with unauthorized use of the mail—sending documents to another inmate which constituted contraband and an alleged threat to the orderly operation of the institution. The infraction report prepared by defendant Edwards noted that the mail from plaintiff contained legal work done by the plaintiff for another inmate. According to the infraction: "An Inmate doing legal work for another I/M creates an inmate to inmate debt which is a threat to the orderly operation of the institution." (Ex. 2 to Ct.Rec. 58.)

Lt. Pease agreed with the reasoning of Evonne Edwards. According to him, he found plaintiff guilty because allowing one inmate to draft legal pleadings and materials for another inmate's use in litigation has the "very real potential" to create an inmate-to-inmate debt. Pease indicates that in the past, WSP has had problems with inmates blackmailing and extorting one another based on debts incurred for legal work performed. Pease adds that WSP has experienced problems with inmates becoming angry and violent with inmates who drafted and/or filed pleadings or legal materials for inmate litigators when litigators' expectations were not met or the consequences of the legal action turned out to be detrimental to the litigators. (Affidavit of Pease, Ex. 3 at Ct.Rec. 58.)

Washington Administrative Code (WAC) 137–48–040 authorizes correctional officials to disapprove for receipt incoming or outgoing mail which contains contraband or is deemed to be a threat to legitimate penological objectives. "Contraband" includes any item that is controlled, limited, or prohibited on the grounds or within the secure perimeter of a

---

**1.** Also dismissed was the plaintiff's due process claim concerning downgrading of his custody classification.

**2.** In his response to the summary judgment motion, plaintiff cites a Ninth Circuit decision—*Newell v. Sauser*, 64 F.3d 1416 (9th Cir.1995). In that case, corrections officials seized approximately 59 pages of computer-generated rough draft legal materials written by an inmate on behalf of another inmate. Plaintiff was infracted and sanctioned. The Ninth Circuit panel acknowledged that proper time, place, and manner restrictions could be adopted by prison officials to curtail the First Amendment rights of jailhouse lawyers. Such regulations, however, had not been enacted in that case. The panel held that the inmate had a clearly established right to have legal materials, including those of another inmate, in his cell. *Id.* at 1419–20. In the instant case, plaintiff was not infracted for possessing another inmate's legal materials. In addition, as will be discussed later, there is a proper time, place and manner restriction in this case. Furthermore, the *Newell* case does not specifically discuss the issue of sending draft legal pleadings to other inmates. Finally, and most importantly, plaintiff is informed that the panel's decision in *Newell* was withdrawn in an order filed December 18, 1995. *Newell v. Sauser*, 72 F.3d 110 (9th Cir.1995). Therefore, the decision reported at 64 F.3d 1416 is of no precedential value.

correctional facility as defined by departmental, division, or institutional regulation and approved by the secretary of the department, or the division director/designee. WAC 137–48–020(1).

■ Prison inmates do enjoy a First Amendment right to send and receive mail. *Witherow v. Paff,* 52 F.3d 264, 265 (9th Cir. 1995) *citing Thornburgh v. Abbott,* 490 U.S. 401, 407, 109 S.Ct. 1874, 1878–79, 104 L.Ed.2d 459 (1989). However, a prison may adopt regulations which impinge on an inmate's constitutional rights if those regulations are reasonably related to legitimate penological interests and operate in a neutral fashion. *Id. citing Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987).

*Turner v. Safley* sets forth other factors to be considered in determining whether a prison regulation or practice is reasonable: 1) whether there are alternative means of exercising the right that remain open to the inmates; 2) the impact that accommodation of the asserted constitutional right would have on guards and other inmates, and on the allocation of prison resources generally; 3) whether any ready alternatives exist to the prison regulation which fully accommodate the inmate's constitutional right and can be implemented at de minimis cost to valid penological interests. 482 U.S. at 89–90, 107 S.Ct. at 2261–62.

Prevention of extortion and blackmail, and avoidance of tension among inmates, is certainly a legitimate penological interest.[3] A policy (written or unwritten) that prohibits one inmate from preparing pleadings for another inmate is reasonably related to that legitimate penological interest. As plaintiff notes, the defendants have not cited any specific examples of problems among inmates. On the other hand, it must be kept in mind that the courts owe a certain amount of deference to the decisions of administrators who are charged with and trained in the operation of the prison. *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979). All that is necessary is a "reasonable relationship" between the regulation or practice and the interest to be served. According to the Supreme Court in *Turner v. Safley:*

> Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision-making process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts would inevitably become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration."

(Citation omitted.) 482 U.S. at 89, 107 S.Ct. at 2262.

Because there are other forms of permissible inmate assistance, the second *Turner* factor is satisfied. Plaintiff cannot send draft legal pleadings via the mail to his fellow inmates, but DOP Policy allows him to confer with fellow inmates in the research and preparation of pleadings, subject to reasonable limitations imposed by the Superintendent. Plaintiff's right of free speech and freedom of association to confer with an inmate about legal matters is preserved. In addition, it does not appear that there is a blanket prohibition on inmates writing to other inmates about legal matters, as long as the writing is not in the form of a draft pleading.[4]

---

**3.** Plaintiff has cited a district court case recognizing that an inmate rendering assistance to another inmate creates an opportunity for "exploitation." *Weaver v. Toombs,* 756 F.Supp. 335, 339 (W.D.Mich.1989) *affirmed* 915 F.2d 1574 (6th Cir.1990). In that case, to avoid such exploitation, prison officials had a regulation requiring that prisoners giving or seeking legal assistance agree in writing as to the terms of any such arrangement. The court found that the regulation was reasonably related to a valid penological interest.

**4.** The fact that Washington DOC does not have a regulation similar to that discussed in *Weaver v. Toombs* (allowing inmates to enter into a written agreement concerning inmate assistance subject to approval by prison officials) does not make

One might argue that allowing inmates to "confer" with one another in the research and preparation of legal pleadings is essentially no different than allowing inmates to prepare legal pleadings for other inmates. Consequently, one might argue that the threat of extortion, blackmail, and creation of tension among inmates, is just as substantial. On the other hand, the DOP Policy gives the Superintendent the authority to limit the time, manner, and place of such inmate conferences and therefore, contemplates a substantial degree of supervision over inmate-to-inmate communication concerning legal matters. Furthermore, an inmate who simply confers with another inmate exercises less potential control over the other inmate's litigation than if he is actually preparing the pleadings which are used in the litigation. There is a compelling enough distinction between "conferring" and actual drafting of pleadings such that the prohibition on drafting of pleadings appears reasonable.[5]

It is difficult to assess the precise impact on prison resources and staff of allowing inmates to prepare and send draft legal pleadings to other inmates. However, because it reasonably appears that allowing such activity creates a potential for extortion, blackmail, and tension among inmates, one can reasonably assume that a prohibition on such activity makes it easier to maintain the orderly operation of the institution.

Based on the *Turner* analysis, prohibiting inmates from preparing draft pleadings and sending those pleadings to other inmates is a reasonable infringement on the constitutional rights of inmates, and is therefore not a constitutional violation.[6]

Even were it assumed that a constitutional violation occurred, any defendants involved in the actual confiscation of the draft pleading and the subsequent processing of the infractions against the plaintiff would be entitled to qualified immunity from damages. Permitting damages suits against government officials can result in substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). Accordingly, "[G]overnment officials performing discretionary functions[ ] generally are shielded from liability for civil damages [in a section 1983 action] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. This "clearly established law" test requires more than an alleged "violation of extremely abstract rights." *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Rather, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. at 3039. In other words, "in the light of preexisting law, the unlawfulness must be apparent." *Id. See: Lum v. Jensen, et al.,* 876 F.2d 1385 (9th Cir.1989), *cert. denied* 493 U.S. 1057, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990); *The Presbyterian Church (U.S.A.) v. United States,* 870 F.2d 518, 527 (9th Cir. 1989); *Tribble v. Gardner et al.,* 860 F.2d 321, 324 (9th Cir.1988), *cert. denied* 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989).

unreasonable the existing Washington DOC regulations and practices concerning inmate assistance. Washington DOC officials have chosen reasonable alternatives which they believe are sufficient to accommodate the interests of inmates in giving and seeking inmate assistance.

The fact that co-plaintiff inmates are allowed, subject to the approval of prison officials, to exchange "legal" mail, which may include pleadings, does not make it per se unreasonable to prohibit the exchange of draft pleadings between inmates who are not co-plaintiffs. See DOP 590.500(A) re "Legal Communications." Because co-plaintiffs share a unity of interest in their litigation, it appears less likely that they would try to extort, exploit, or blackmail one

another. Furthermore, co-plaintiff activity is expressly subject to the supervision of the Superintendent.

5. Plaintiff also indicates that the draft pleading he authored for inmate Skylstad ultimately ended up in the possession of inmate Skylstad. It may well be that this is nothing more than a fortuitous event. Whatever, the case, it does not make the confiscation of the pleading and the infraction of the defendant any less reasonable.

6. There is no evidence that plaintiff has been treated any differently from other inmates who have attempted to send out draft pleadings to fellow inmates.

The plaintiff has not made the court aware of, nor is the court aware of, any clearly established law that an inmate has an unfettered constitutional right to send draft legal pleadings to another inmate. It would definitely be stretching it to say that such a right is apparent from the clearly established right of inmates to send and receive mail. Even the right to send and receive mail is not unfettered. It is subject to legitimate restrictions.

Summary judgment for defendants on plaintiff's First Amendment claim, concerning sending of draft pleadings to other inmates, is warranted.

## 2. Due Process

Plaintiff asserts a Fourteenth Amendment due process claim based on the same facts and circumstances surrounding his First Amendment claim. Plaintiff asserts that because he has a constitutional right to send draft pleadings to other inmates, the infractions against him for undertaking such action are not supported by "some evidence."

Because plaintiff does not have a constitutional right to send such pleadings, logically there was "some evidence" to find him guilty of unauthorized use of the prison mail system. WAC 137–28–025(303). Because the exchange of draft pleadings among inmates creates a bona fide risk of extortion, blackmail and escalation of tension in the prison population, the "701" infraction is also supported by "some evidence." A "701" infraction involves the commission of a general infraction in such a manner as likely to result in danger to life or limb or to create a risk to the orderly operation of institution or the health and safety of its inmates, staff, or visitors. WAC 137–28–030(701). In this case, plaintiff was charged with committing a 303 violation in a manner likely to result in danger or to create a risk of harm.

█ Whether there is "some evidence" to support a finding of guilt on an infraction is one of the safeguards for preserving liberty interests protected by the Due Process Clause. The findings of a prison disciplinary board which result in the loss of a protected liberty interest must be supported by "some evidence on the record." *Superintendent v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985); *Bostic v. Carlson,* 884 F.2d 1267, 1269–70 (9th Cir.1989). Under the *Hill* analysis, the court determines "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Hill,* 472 U.S. at 455–56, 105 S.Ct. at 2774. The record must not be "so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary." *Id.* at 457, 105 S.Ct. at 2775.

The first part of any Due Process analysis is whether there is in fact a "protected liberty interest." In *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the United States Supreme Court addressed the issue of liberty interests in the disciplinary hearing context. Following *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court stated that it recognized that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. However, according to the Court:

> [T]hese restraints will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

—— U.S. at ——, 115 S.Ct. at 2300. The Court added that state action taken for a punitive reason does not necessarily encroach upon a liberty interest under the Due Process Clause, even in the absence of state regulation. Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law. *Id.* at ——–——, 115 S.Ct. at 2300–01.

█ In inmate Conner's case, the Court found that although his segregated confinement was indeed punitive, it did not present a "dramatic departure" from the basic conditions of his indeterminate sentence (30 years to life). The Court held that inmate Conner's placement in segregated confinement did not present the type of atypical,

significant deprivation in which a state might conceivably create a liberty interest. For example: 1) disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody; and 2) Conner's confinement did not exceed similar, but totally discretionary confinement in either duration or degree of restriction. With respect to the latter, the Court noted that the "high misconduct" charge against Conner had been expunged nine months after he had served time in segregation and that the conditions at the prison involved significant amounts of lockdown time even for general population inmates. The Court added that inmate Conner's situation did not present a case where the disciplinary action would inevitably affect the duration of his sentence. Nothing in the Hawaii Code required the parole board to deny parole in the face of the misconduct record or to grant parole in its absence. *Id.* at ——–––, 115 S.Ct. at 2301–02.

In the instant case, plaintiff Schenck was given a suspended sentence. As it turned out, he never spent a day in disciplinary segregation, even though he was found guilty of the infractions charged against him. There is no evidence that the finding of guilt on the infractions has affected the duration of plaintiff's sentence. The plaintiff did not lose any good-time credits.

Based on *Sandin*, the court must conclude that plaintiff did not suffer an atypical deprivation and that therefore, he was not deprived of a liberty interest protected by the Due Process Clause. Accordingly, plaintiff was not entitled to any of the Due Process protections set forth in *Superintendent v. Hill*, ("some evidence") or in *Wolff v. McDonnell*, 418 U.S. at 564–66, 94 S.Ct. at 2978–80 ((1) advance written notice of the charges, (2) an opportunity to call witnesses and present documentary evidence, provided that to do so will not jeopardize institutional safety or correctional goals, and (3) a written statement by the factfinder of the evidence

relied upon and reasons for the disciplinary action taken).

Because plaintiff does not have a constitutionally protected liberty interest, the court need not address plaintiff's claim concerning denial of witnesses at his disciplinary hearing. However, assuming the plaintiff did have some type of protected liberty interest at stake, there was no violation of plaintiff's procedural due process rights.

■ The record shows that plaintiff was allowed to request written witness statements and that such statements were obtained from Scott Skylstad, Rick Young[7], and Correctional Officer Partlow. Lt. Pease, the hearing officer, determined that it was not necessary to obtain a written statement from Evonne Edwards or to have her physically present at the hearing. According to Lt. Pease, "her involvement was minimal and . . . the reasons she charged inmate Schenck with the infractions were sufficiently explained in the infraction report." (Affidavit of Pease, Ex. 3 at Ct.Rec. 58.)

The plaintiff complains that he was not allowed to have any of his requested witnesses physically present at the hearing. The court fails to see how this caused the plaintiff any prejudice. Plaintiff admits that he authored a draft pleading which he then tried to send to inmate Skylstad. This is all the evidence that prison officials needed to find plaintiff guilty of an unauthorized use of the prison mail system. Plaintiff does not indicate what testimony from any of his requested witnesses would have exculpated him. In his written statement, inmate Skylstad states that he requested inmate Schenck to mail his (Skylstad's) legal work to him. (Ex. 4 to Ct.Rec. 58.) Inmate Young merely indicates that he cut several large manilla envelopes and taped them for inmate Schenck in the library. (Ex. 5 to Ct.Rec. 58.) In his written statement (Ex. 6 to Ct.Rec. 58), Correctional Officer Partlow indicated that he had no knowledge about the infraction. Plaintiff claims that if Partlow had been physically present at the hearing, the plaintiff could have had him testify that he

---

7. Defendants refer to a witness statement from an inmate Hartley; however, this appears to be an error. (Ex. 5 to Ct.Rec. 58.)

personally placed in the mailbox the envelope containing the draft legal pleading. (Affidavit of Schenck, Ct.Rec. 78.) This testimony does not exculpate plaintiff from the charge of unauthorized use of the mail. There is no indication that Partlow knew of the contents of the envelope or that he expressly authorized plaintiff to send a draft legal pleading to another inmate.

 Plaintiff intimates that he was not given fair notice that his conduct was prohibited. Due process requires fair notice of prohibited conduct before a sanction can be imposed. *Williams v. Nix*, 1 F.3d 712, 716 (8th Cir.1993). As noted, DOP 590.500 does not contain an express prohibition against drafting pleadings for other inmates. However, the policy also says nothing about allowing inmates to draft pleadings for one another. It only authorizes them to "confer" with one another.

None of the WAC regulations pertaining to mail specifically address the question of draft pleadings. However, one cannot realistically expect prison officials to make and be bound by an exclusive list of every item constituting "contraband." Prison officials must have some flexibility to address situations as they arise. They cannot be unduly restricted in defining what might constitute "contraband."

Plaintiff has not produced any evidence to indicate that WSP has arbitrarily singled him out for such conduct; that WSP administers its policy against draft pleadings in a selective fashion; or that the policy was recently initiated in response to plaintiff's actions as a "jailhouse lawyer."

Even assuming that there was some type of due process violation, the qualified immunity analysis discussed above in relation to plaintiff's First Amendment claim is equally applicable here to immunize the defendants from liability for damages. There is no clearly established law that inmates are entitled to send draft pleadings to one another.

3. Cell Search

 Ordinarily, an inmate has no reasonable expectation of privacy as to his jail cell or his possessions within it. *Mitchell v. Dupnik*, 67 F.3d 216, 220 (9th Cir.1995) *cit-*

*ing Hudson v. Palmer*, 468 U.S. 517, 525–26, 104 S.Ct. 3194, 3199–3200, 82 L.Ed.2d 393 (1984). However, inmates retain a "remedy for calculated harassment unrelated to prison needs." Prison officials cannot ride roughshod over inmates' property rights because the "Eighth Amendment always stands as a protection against 'cruel and unusual punishments.'" *Hudson*, 468 U.S. at 530, 104 S.Ct. at 3202.

 In addition to asserting that his Eighth Amendment rights were violated, plaintiff asserts that his First Amendment rights were violated by the cell search—specifically, his rights pertaining to inspection of his legal documents outside of his presence and to petition the government for redress of grievances. Petitioner alleges that two separate searches of his cell occurred on April 19, 1995—the first one lasting 54 minutes, and the second one lasting approximately 2 hours and 45 minutes. According to plaintiff, the searches occurred between 10:05 a.m. and 1:50 p.m. Plaintiff states the searches occurred after he filed his appeal from Lt. Pease's finding of guilt on the 303 and 701 infractions.

In his affidavit, Lt. Pease indicates that only one search took place on April 19 and that it lasted 54 minutes. According to Pease, after the disciplinary hearing was concluded, he "could not locate the legal documents belonging to inmate Skylstad which had been admitted as evidence against inmate Schenck at his disciplinary hearing." Pease says it was his belief that inmate Schenck might have confiscated these documents during the hearing because he was very concerned about retaining the documents. Pease also alludes to some comment made by inmate Skylstad to one of the correctional officers. Pease says he authorized the cell search to determine whether Schenck had the documents. He further indicates that he instructed Officers Whalen and Pierce to "scan" plaintiff's legal materials.

Plaintiff asserts that the reasoning offered by Lt. Pease for the search is bogus and was used merely as a pretext for going through all of the legal documents in plaintiff's cell. Plaintiff suggests that it would have been impossible for him to smuggle any docu-

ments out of the disciplinary hearing because of the fact that the hearing officer sits so close to the inmate and because there is another correctional officer at the hearing who stands alongside the seated inmate. According to the plaintiff, one of the officers who searched his cell (Pierce), told him that he had been ordered to look for other prisoners' legal documents and to search for any personal log containing a record of payment from other inmates for legal assistance rendered.

Plaintiff asserts that Pease knew of the plaintiff's appeal at the time he ordered the cell search and that the search was ordered in retaliation for the plaintiff pursuing his appeal rights. Pease denies that he had any knowledge of the appeal at the time he ordered the search.

Finally, plaintiff asserts that Officers Whalen and Pierce read his legal documents outside of his presence during the course of his cell search. In support of this allegation, plaintiff offers the affidavit of an inmate (Richard Wild) who observed the officers during the course of the search. Plaintiff suggests that because of the length of the searches, the officers must have done more than merely "scanning" of the legal documents. Plaintiff asserts that these actions violate his constitutional rights, as well as DOP policy.

Plaintiff admitted to Lt. Pease that he was sending a draft pleading to another inmate. Draft pleadings constitute contraband according to WSP policy and legitimately so, based on the *Turner v. Safley* analysis referenced above. Because of plaintiff's admission, Lt. Pease had a reasonable basis for ordering an inspection of the legal documents in plaintiff's cell to determine whether any of those documents belonged to other inmates

or were draft pleadings intended for other inmates.[8] The ordering of the search was reasonably related to legitimate penological goals, whether or not Lt. Pease legitimately believed that plaintiff had smuggled documents out of the disciplinary hearing. As such, the directives of Lt. Pease do not constitute harassment unrelated to legitimate prison needs in violation of the Eighth Amendment (*Hudson v. Palmer*), nor do they constitute retaliation unrelated to legitimate penological goals. *Barnett v. Centoni*, 31 F.3d 813, 815–16 (9th Cir.1994).

*Mitchell v. Dupnik*, (cited *supra*), involved a claim by an inmate that a corrections officer had interfered with a constitutionally protected liberty interest by searching the inmate's legal papers outside of his presence, in knowing violation of jail policy. The Ninth Circuit, employing the *Sandin v. Conner* analysis, found there was no protected constitutional interest. According to the circuit, although there was concededly a violation of a jail regulation providing for inmates to be present when their legal papers were searched, "[T]he prisoner, his cell and all his other possessions, ... are already subject to inspection at any time and for *any or no reason.*" (Emphasis added). The circuit concluded that the inspection of legal papers was simply not a dramatic departure from the basic conditions of incarceration. The circuit added that its holding explicitly recognized that regulations governing the inspection of an inmate's legal papers are not legally enforceable.[9] 67 F.3d at 221.

Based on *Hudson* and *Mitchell*, the plaintiff does not have a constitutional claim pertaining to the inspection of legal papers outside of his presence during the course of a cell search. Plaintiff does not have a constitutionally protected interest (property or lib-

---

8. Possession of another inmate's legal documents is specifically forbidden pursuant to DOP Policy 590.500. Although that precise issue is not before the court, the prohibition appears reasonably related to legitimate penological goals based on the same reasoning supporting the prohibition against exchange of draft pleadings among inmates.

9. The DOP does not have a policy pertaining to inspection of legal documents in the inmate's cell. However, it does have a policy prohibiting the "reading" of such documents. It provides that personal legal documents/papers are excluded from reading by facility staff during inspections and security searches, provided that the inmate ensures that the documents are placed in

erty).[10]

In *O'Keefe v. Murphy,* 860 F.Supp. 748 (E.D.Wash.1994), the Honorable Alan A. McDonald held that an inmate's presence is required during the inspection of his incoming and outgoing grievance mail. In CY–94–3117–LRS, *Schenck v. Wood, et al.,* the undersigned has extended that requirement to the photocopying of an inmate's grievance mail. *O'Keefe* does not compel the undersigned to conclude that an inmate's presence is also required during the inspection of his legal papers during the course of a cell search. This is so for several reasons.

Obviously, the first and most important reason is the Ninth Circuit's holding in *Mitchell v. Dupnik.* Secondly, a cell search is distinguishable from the situations involving inspection and photocopying of grievance-related documents. In those situations, inmates are voluntarily making their documents available for inspection in order to have them mailed or photocopied. In that sense, the documents are perhaps entitled to a greater degree of privacy and confidentiality. Thirdly, requiring the inmate's presence during a cell search takes away the element of surprise and randomness which makes such searches so effective in ferreting out contraband. According to the Supreme Court:

> Virtually the only place inmates can conceal weapons, drugs, and other contraband is in their cells. *Unfettered* access to these cells by prison officials, thus, is imperative if drugs and contraband are to be ferreted out and sanitary surroundings are to be maintained.

*Hudson v. Palmer,* 468 U.S. at 527, 104 S.Ct. at 3200 (emphasis added). The Court added that the uncertainty involved in random searches renders them perhaps the most effective weapon in the fight against contraband. This is because the inmates have no way of anticipating when the searches will be conducted. *Id.* at 528–29, 104 S.Ct. at 3201–02.

At a minimum, Lt. Pease and Officers Whalen and Pierce are entitled to qualified immunity from damages. The court is not aware of any clearly established law in this circuit which requires the inmate's presence during an inspection of the legal documents in his cell. One cannot legitimately extrapolate the reasoning from *O'Keefe,* concerning incoming and outgoing grievance mail, and conclude that it amounts to clearly established law that an inmate's legal documents in his cell may only be inspected in his presence. Furthermore, a reasonable officer could believe that inspecting an inmate's legal documents outside his presence is lawful, particularly in light of *Hudson v. Palmer* and *Mitchell v. Dupnik.*

Plaintiff alleges that Officers Whalen and Pierce did more than just inspect his legal documents. He claims they read those documents and in doing so, violated his constitutional rights. The analysis in *Mitchell v. Dupnik* may also be appropriate in this instance, even though the issue is the "reading" of documents versus a mere inspection. If an inmate does not have a reasonable expectation of privacy in his cell, it would not seem to matter whether the documents are read instead of inspected. As such, a constitutional right is not created by DOP Policy which prohibits reading of legal documents which are in a clearly marked container in an inmate's cell. It is not an atypical deprivation to read the documents because the prisoner has no reasonable expectation of privacy in his cell.

There is definitely a fine line between scanning documents and actually reading them. To an inmate, "scanning" a document may certainly appear like the document is actually being read. As noted, one of the purposes of requiring inmates to be present

---

a separate authorized container which is clearly marked. DOP 590.500(C)(5).

**10.** Strictly speaking, plaintiff does not present his claim as one premised on the Fourteenth Amendment Due Process Clause. However, the protections of the First and Eighth Amendment apply to the states through the "substantive" element of the Due Process Clause. *See generally United*

*Mine Workers v. Illinois State Bar Association,* 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) and *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Thus, a constitutionally protected interest cannot arise except through the Due Process Clause or because it is created by the state.

when their mail is inspected is to insure that it is not read. Judge McDonald's decision in *O'Keefe* recognizes that allowing correctional officials to read the grievance-related mail of inmates has the effect of "chilling" meritorious petitions. *In accord, Bieregu v. Reno,* 59 F.3d 1445, 1456 (3rd Cir.1995) (reading legal mail infringes right of access even more than simply opening and inspecting it); *Jordan v. New Jersey Dept. of Corrections,* 881 F.Supp. 947, 953 (D.N.J.1995) (prisoners have a constitutional right (right of access to courts) not to have their legal mail read by prison officials); *Proudfoot v. Williams,* 803 F.Supp. 1048, 1052–53 (E.D.Pa.1992) (legal mail read by prison employees creates a risk of a "chill" rendering the prisoner unwilling or unable to raise substantial legal issues critical of the prison or prison employees and therefore, violates prisoner's right of access to the courts).

Plaintiff says the length of the searches conducted by the officers is proof that the officers must have read the documents. Although plaintiff asserts that there was a second search of his documents lasting 2 hours and 45 minutes, he does not provide an evidentiary basis for this statement (i.e. he does not tell us how he knows this occurred). He was not present during the search. He merely asserts that the defendants conveniently failed to provide a written log which would show the second search. Plaintiff's witness, inmate Richard Wild, states the search was "lengthy," but he says nothing about the actual length of the search or whether there were separate searches. (Ex. to Ct.Rec. 78).[11] He says that on "three occasions" he observed the officers "going through" plaintiff's legal documents and that the "documents [he] observed the officers reading were marked 'United States District Court.'" There is no indication how many legal documents the plaintiff may have had in his cell.

The plaintiff does not allege nor is there any evidence that any of his legal documents were censored, destroyed, or altered. Plaintiff does not claim that any of the documents came up missing following the search of his cell. Plaintiff does not allege, nor is there any evidence, that the search of the documents somehow disrupted his ability to continue litigation or grievance proceedings against prison policies and prison officials. The documents briefly seized from plaintiff's cell appeared to belong to another inmate, Charles Dunnick. As such, the officers could have reasonably suspected them to be contraband. When, however, it was verified that plaintiff and Dunnick were co-plaintiffs in litigation, the documents were promptly returned to the plaintiff.

There is no credible evidence that plaintiff suffered some type of retaliatory act (unrelated to legitimate penological goals) following completion of the search, which could reasonably be connected to the inspection of his legal documents on August 19, 1994.[12]

The case law cited above (*Bieregu, Jordan,* and *Proudfoot* ) is premised on the First Amendment right of access to the courts. In this circuit, prisoners who do not allege a violation of core *Bounds* requirements (provision of an adequate law library or a professional or quasi-professional legal services plan), *Bounds v. Smith,* 430 U.S. 817, 830–31, 97 S.Ct. 1491, 1499–1500, 52 L.Ed.2d 72 (1977), must allege actual injury, that is, a specific "'instance in which an inmate was actually denied access to the courts.'" *Sands v. Lewis,* 886 F.2d 1166, 1171 (9th Cir.1989), *quoting Hudson v. Robinson,* 678 F.2d 462, 466 (3rd Cir.1982).

In the instant case, plaintiff has not shown a specific instance of how he was actually denied access to the courts. He has not shown any actual injury whatsoever. Thus, whether or not his legal documents were

---

11. Inmate Wild says he was working as a tier porter on 8–Wing "C" Tier on August 19, 1994. The search report indicates that Schenck's cell was located at "8–C–6."

12. Plaintiff claims that he was subject to a series of retaliatory transfers because of this litigation and other litigation he has before this court and other courts. That is not a claim presently before this court. Furthermore, plaintiff alleges the retaliation is due to his litigation, not because of any particular document that might have been examined during the course of the August 19, 1994 cell search.

read by Officers Whalen and Pierce, there is no constitutional claim.

It is debatable whether *O'Keefe* constitutes clearly established law that the grievance-related documents of an inmate cannot be read when those documents are discovered during the course of a cell search. This is especially so in light of *Hudson v. Palmer* and *Mitchell v. Dupnik.* However, even were Officers Whalen and Pierce guilty of a constitutional violation because they read the documents, they could have reasonably believed their conduct to be lawful in light of *Hudson's* holding that an inmate does not have a reasonable expectation of privacy in his cell. Qualified immunity should be granted *if the right asserted was not "clearly established" or* the officer could have reasonably believed that his particular conduct was lawful. *Romero v. Kitsap County,* 931 F.2d 624, 627 (9th Cir.1991) (citations omitted).

Summary judgment for the defendants on plaintiff's cell search claim is warranted.

## CONCLUSION

**IT IS HEREBY ORDERED:**

1. Defendants' motion to strike (Ct.Rec. 82) is **DENIED.**

2. Defendants' motion for summary judgment (Ct.Rec. 55) is **GRANTED.**

3. Plaintiff's *First Amended Complaint is* **DISMISSED with prejudice.**

4. The parties shall bear their own costs.

5. The Clerk of the Court shall enter judgment accordingly and shall forward copies of this order and the judgment to plaintiff and to counsel for defendants.