David M. GIBA, Plaintiff,

v.

David S. COOK, Nick Armenakis, Les Dolecal, David Schumacher, Dan Johnson, Wade Scrogham, Elwood L. Fogleman, Ron Myers, G. Rodriguez, Leonard W. Messersmith, Laura Carney, Polly Stuart, Kathy Ryals, Bob Snyder, Albert Hazen, Bob Moehlman, Teri Blankenbaker, Darla Cox, Celia Hamilton–Jensen, Kathy Stevens, Diane McCarron, and John Does I–III, Defendants.

No. CV–99–1634–ST.

United States District Court, D. Oregon.

March 31, 2002.

David M. Giba, Eugene, OR, pro se.

Jan Peter Londahl, Leonard W. Williamson, Dept. of Justice, Salem, OR, for Defendants.

## OPINION AND ORDER

STEWART, United States Magistrate Judge.

### *INTRODUCTION*

Plaintiff, David Giba ("Giba"), an inmate at the Two Rivers Correctional Institution, brings this action *pro se* pursuant to 42 USC § 1983. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). Currently before the court is defendants' Motion for Summary Judgment (docket # 27) and plaintiff's Motion to Compel (docket # 33). This court issued Orders dated December 20, 1999, and April 21, 2000 (dockets # 12 and # 31), advising Giba of federal summary judgment standards. For the reasons that follow, defendants' Motion is granted and plaintiff's Motion is denied as moot.

## SUMMARY OF CLAIMS

This action arises out of two misconduct charges brought against Giba while he was an inmate at the Snake River Correctional Institution ("SRCI"). Giba asserts 54 separate claims against 21 prison officials and three unnamed persons. In summary, Giba's alleges that defendants: (1) violated his right to procedural and substantive due process; (2) violated his First Amendment rights to access the courts, free speech and privileged attorney/client communications; (3) conspired to prevent and retaliated against him for attempting to do so; and (4) violated his Fourth Amendment right to be free from unreasonable search and seizure. As a result, Giba seeks compensatory, declaratory, and injunctive relief.

## PLAINTIFF'S REQUESTS

In his response to defendants' motion, Giba repeatedly requests appointment of counsel, additional time for discovery, and leave to amend. He states that he is unlearned in the law, that he feels overwhelmed by the complexity of the legal issues, that the prison's legal assistant is unable to assist him due to a lack of experience in litigating federal civil rights actions, and that his time to use the prison's legal research computer is very limited. Although he believes that the facts clearly reveal that he has suffered an injustice at the hands of numerous prison officials, he has difficulty determining what legal theory or theories should be pursued and how to frame his claims.

On December 1, 1999, this court denied Giba's request for appointment of counsel (docket # 7) and has no reason to reconsider that ruling. Giba's response to defendants' motion demonstrates an unusual ability to articulate his claims, perhaps due to the assistance of his sister who is an attorney. Accordingly, Giba's renewed request for appointment of counsel is denied.

Giba's request for additional time for discovery is also denied. FRCP 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Since April 2000, this court has granted 11 motions by Giba for extensions of time to conduct discovery and to respond to defendants' motion. Given the thoroughness of Giba's response, no additional time for discovery is warranted. Moreover, the Ninth Circuit has held that FRCP 56(f) requires more than "[r]eferences in memoranda and declarations to a need for discovery." *Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir. 1986). Rather, FRCP 56(f) "requires affidavits setting forth the particular facts expected from the movant's discovery. Failure to comply with the requirements ... is a proper ground for denying discovery and proceeding to summary judgment." *Id.* Giba did not fulfill these requirements. Accordingly, this request is denied.

Lastly, Giba makes several requests for leave to amend those claims which he believes are more appropriately pled under his coverup and retaliation claims. Instead of allowing leave to amend, this court will construe those claims as proposed by Giba in his responsive pleading.

## STANDARDS

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law.

The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party does so, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. The court must "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir.1999). A "'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), *cert denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir.1987). The court must view the inferences drawn from the facts in the light most favorable to the non-moving party. Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id.* at 630–31. However, when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required. *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987), *cert denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

**1.** Giba's Response to Defendants' Concise Statement (of Facts) (docket # 84) is over eight pages long and thus exceeds the five page limitation imposed by Local Rule 56.1(d). Also, Giba's 39 page Memorandum of Law Opposing Summary Judgment (docket # 87) exceeds the 35 page limitation imposed by LR 7.2(b). Nonetheless, this court will consider both submissions.

## FACTS

Because all material facts must be viewed in the light most favorable to the non-movant, this court will view the evidence in the light most favorable to Giba. A review of the parties' concise statements of fact,[1] as well as the other materials submitted by the parties, reveal the following.

### I. *Disobedience of an Order*

On November 21, 1997, Parklynd Main ("Main"), a Corporal at SRCI, intercepted a letter from Giba to inmate Brad Cunningham ("Cunningham") at Eastern Oregon Correctional Institution. In the letter, Giba requests Cunningham to provide an affidavit attesting that defendant Laura Carney ("Carney"), an Office Specialist at SRCI, opened and read his legal mail. Giba requested this affidavit because Carney was the person responsible for photocopying inmates' confidential legal documents while the SRCI law library was closed and replaced by contracted legal services. Giba specifically requested that Cunningham "relay sensitive/confidential documents," including the requested affidavit, to Giba's sister Linda Hemphill ("Hemphill"), an attorney in New Mexico, who would forward it to him.

Based on this intercepted letter, defendant Leonard Messersmith ("Messersmith"), a Correctional Officer at SRCI, issued a misconduct report charging Giba with Disobedience of an Order II.[2] Because Giba's confiscated letter also contained sexual innuendos about two female

**2.** Disobedience of an Order II, OAR 291–105–0015(4)(b), occurs either when an inmate "overtly refuses to follow a valid order; or ... fails to comply with a valid order, which creates a threat to the safety, security or orderly operations of the facility ...."

ODOC officials, defendant Les Dolecal ("Dolecal"), an Inspector General at SRCI, began a formal investigation. On January 21, 1998, Dolecal concluded that Giba's allegations were unfounded in light of Giba's recantation.

## II. *Contraband II*

On November 21, 1997, defendant Bob Snyder ("Snyder"), a Correctional Officer at SRCI, searched Giba's cell outside of his presence. Giba claims that this search took place because of his intercepted letter to Cunningham. Snyder found documents containing information on SRCI staff in Giba's archive box clearly labeled "confidential—legal matters." Another inmate had obtained this information through discovery in a separate suit and Giba had retained photocopies of these documents for approximately ten months even though there had been "numerous" cell searches. Since inmates are not authorized to possess documents belonging to other inmates or confidential, sensitive information on staff, Snyder issued a misconduct report charging Giba with Contraband II.[3]

## III. *Disciplinary Hearings*

On November 26, 1997, defendant Ron Myers ("Myers"), a Hearings Officer at SRCI, held two separate disciplinary hearings for these misconduct violations. At the Contraband II hearing, Giba admitted that he had made copies of legal documents that another inmate had previously obtained through discovery in a separate suit against ODOC. However, Giba was not allowed to explain that he was not doing legal work for another inmate or misusing these photocopied legal documents. Nonetheless, Myers lessened the charge to a minor offense of Contraband III.[4] He sanctioned Giba to seven days of Loss of Privileges and ordered that the contraband be confiscated and destroyed.

At the second disciplinary hearing on the Disobedience of an Order charge, Giba acknowledged that he sent the letter to Cunningham and "knew there was a rule that an inmate's [sic] not allowed to give something to another inmate." Affidavit of Ron Myers ("Myers Aff"), attach. 2, pp. 14–15. However, Giba explained that he was trying "to avoid getting any kind of write up" and "didn't think there was anything illegal" in requesting that Cunningham send an affidavit to his attorney-sister who would, in turn, forward it to Giba. *Id.* When Giba asked what specific rule he violated, Myers responded that Giba "attempted to violate the Mail Rule by sending documentation through [his] sister so that it would come in [as] legal mail so that staff wouldn't review it." *Id.* at p. 16.

Giba still did not believe that he violated a valid rule or order and did not see how this act posed a "threat to the safety, security or orderly operation of the institution." Myers, however, disagreed and found Giba guilty of Disobedience of an Order II and sanctioned him to seven days of Disciplinary Segregation and 14 days of Loss of Privileges, which totaled 21 days of Loss of Privileges when combined with the first disciplinary finding. Defendant Albert Hazen, a Correctional Officer at SRCI, signed the sanction order.

---

**3.** Contraband II, OAR 291–105–0015(1)(e), prohibits an inmate from possessing "contraband which creates a threat to the safety, security or orderly operation of the facility (e.g., razor blades, checks, tobacco, ... tattoo equipment or paraphernalia, unauthorized medication ... and items of barter ...) or ... contraband which was obtained by threats of or actual violence or by theft ..., forgery, or coercion."

**4.** Contraband III, OAR 291–105–0015(1)(f), is a "minor violation" and prohibits an inmate from possessing "legal materials belonging to another inmate ...."

Giba's appeal to defendant Dan Johnson, the former Superintendent at SRCI, was unsuccessful. Additionally, Giba was unable to convince Myers or defendant Bob Moehlman, the Hearings Support Officer at SRCI, to return the confiscated documents. Giba sent several letters to Myers and defendants Darla Cox, a Hearings Support Officer at SRCI, and Celia Hamilton–Jensen, a Correctional Officer and/or a Hearings Support Officer at SRCI, in an unsuccessful effort to obtain copies of the two Misconduct Reports, a Notice of Rights, the letter that he had written to Cunningham, and a hearing transcript or taping. Defendants Dolecal, David Cook ("Cook"), ODOC's Director, and Nick Armenakis ("Armenakis"), ODOC's Assistant Director, also refused to intervene. Giba's sister also was unsuccessful in obtaining information regarding the disciplinary sanctions from Myers or defendants Wade Scrogham and David Schumacher, Myers' supervisors.

On December 4, 1997, defendant Elwood Fogleman, an ODOC Investigator, met with Giba and questioned him about the reference in his letter to Cunningham to an ODOC official as being his "main squeeze."

## IV. Other Incidents

### A. Change in Work Assignment

On December 8, 1997, Giba was reassigned from working on the recycling crew to a less desirable position of graveyard corridor where he was awakened shortly before midnight five nights a week, taken to remote locations in the prison, and forced to scrub walls and floors. Defendant Gilberto Rodriguez ("Rodriguez") is a Correctional Captain at SRCI. Although Giba's alleges that Rodriguez changed Giba's work assignments, the evidence es-

tablishes that he made no decision in that regard.

During the afternoon of December 9, 1997, Giba was awakened in the middle of the day to participate in a one-time only work crew. Defendant Katelyn McCarron ("McCarron"),[5] an Office Specialist at SRCI, issued Giba a minor violation of Unauthorized Area II because she noticed that he was missing from the work crew and found him in a staff restroom that was off-limits to inmates. Giba was still credited for working eight hours. On December 19, 1997, in response to a kyte from Giba, an SRCI official explained that his job was reassigned due to "security reasons" and that he "may request work else where [sic]." Pltf's Ex 9.

On December 23, 1997, Giba again left his work area without authorization and McCarron located him in an inmate restroom. This time she ordered Giba to sit on the floor of a corridor until he was later removed from the area by Lieutenant Hardy. Giba did not receive formal charges for this second incident, but was returned to his housing unit and did not receive credit for working that day.

### B. Custody Risk Classification

An inmate's custody risk classification is based on a matrix intersection of Public Risk and Institutional Risk scores. To obtain a minimum risk custody status, an inmate must score less than 102 on Public Risk and less than 53 on Institutional Risk. On May 22, 1997, prior to the November 21, 1997 violations, Giba's Public Risk score of 80 qualified him for minimum custody risk status, but his Institutional Risk score of 61 was nine points too high. Six months later, on December 5, 1997, defendant Teri Blankenbaker ("Blanken-

---

**5.** The Complaint incorrectly names Dianne McCarron as a defendant. It appears the defendant's correct name is Katelyn McCarron. *See* Affidavit of Katelyn McCarron.

baker"), a Correctional Counselor at SRCI, again assigned Giba a medium custody risk classification. She calculated Giba's Public Risk as 83, which did not affect his custody risk status, and his Institutional Risk as 58, which was still too high for a minimum risk custody classification. Giba requested administrative review of this custody risk classification, but it remained unchanged.

On May 8, 1998, at the next six month review, defendant Blankenbaker again classified Giba as medium risk. Although Blankenbaker lowered Giba's Institutional Risk score to 39, which qualified him for a minimum risk custody classification, this time she raised his Public Risk score to 112, which was 11 points too high. For reasons that are not clear in the record, it appears that the main change in Giba's Public Risk score resulted from an increase in his projected release date from one point (less than 13 months) to 30 points (37 months or more).

Blankenbaker can recommend a higher or lower custody classification, but found no special circumstances to warrant a departure from the objective matrix classification of medium custody. Blankenbaker, however, did erroneously mark Giba as noncompliant on his primary program performance because she did not verify that Giba had requested to be placed on the waiting list for a cognitive self restructuring class. However this error, even if corrected, would have not reduced his Public Risk score enough to obtain minimum custody status according to the matrix.

### C. *Unprocessed Grievances*

In March and April 1999, defendant Polly Stuart ("Stuart"), formerly a Grievance Coordinator at SRCI, returned three grievances to Giba without processing

them because he complained of matters relating to his disciplinary hearings.[6] Defendant Kathy Ryals ("Ryals"), the Grievance Coordinator at SRCI, also returned Giba's grievances unprocessed because there was no decision to appeal.

### DISCUSSION

■ In a claim arising under § 1983, a plaintiff must show that: (1) the conduct which he complains of was committed by a person acting under color of state law; and (2) the conduct deprived him of "rights, privileges, or immunities secured by the Constitution and laws of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994); 42 USC § 1983.

### I. *Personal Participation*

The core theme in Giba's allegations is that all 21 prison officials and three unnamed defendants retaliated against him because he was collecting evidence to prove that Carney inappropriately opened his legal mail. Giba does not allege that each defendant was directly involved in each alleged incident nor does he allege that each defendant directed or ordered disciplinary violations.

■ "Liability under section 1983 arises only upon a showing of personal participation by the defendant" in the alleged constitutional deprivation. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989). Liability may also be imposed if the defendant sets into " 'motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.' " *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1044 (9th Cir.1994), quoting *Merritt*

**6.** Pursuant to OAR 291–109–0015(3)(e), an inmate cannot grieve "[i]ncidents or actions for which there exists a separate appeal or review process, i.e., misconduct reports ...."

*v. Mackey,* 827 F.2d 1368, 1371 (9th Cir. 1987).

■ Additionally, liability is imposed upon a "supervisory official . . . for his own culpable action or inaction in the training, supervision, or control of subordinates; for his acquiesce[nce] in the constitutional deprivations of which [the] complaint is made; or for conduct that showed a reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir.1991) (internal citations and quotations omitted). For supervisory liability to attach in the absence of direct participation, a plaintiff must establish a sufficient or causal connection between the supervisor's wrongful conduct and the constitutional violation. *See Hansen v. Black,* 885 F.2d 642, 646 (9th Cir. 1989). Based on these standards, this court must analyze the conduct of each defendant separately.

### A. *Stevens*

■ Giba alleges that defendant Kathy Stevens' ("Stevens"), the Mail Processing Center Supervisor at SRCI, "response may have been truthful" when she answered Giba's grievance complaint (alleging that his outgoing mail to his attorney-sister had been opened and resealed) by stating that "[s]he ha[d] no documentation that staff in the mail processing center opened any legal mail. We are very careful on this issue." It is difficult to perceive how Stevens personally participated in any alleged conduct simply by notifying Giba that she had no documentation of any improper opening of his legal mail by other SRCI officials. Thus, the claims against Stevens are dismissed.

### B. *John Does I–III*

Giba filed the Complaint on November 19, 1999, but has not yet named defendants John Does I–III. He filed a Motion to Compel on April 20, 2000 (docket # 33) to ascertain the names of these individuals and now requests additional time for further discovery.

Without further pursuing John Does II and III, Giba asserts that John Doe I is Corporal Main because she intercepted his mail to inmate Cunningham and likely was offended by his reference in that letter to her as his "main squeeze" which, in turn, sparked the retaliatory acts by the other 21 named ODOC officials. This is sufficient to substitute Corporal Main as John Doe I. However, there is no evidence identifying John Does II and III or even describing how they personally participated in any alleged acts underlying this § 1983 claim. Accordingly, Corporal Main is substituted for John Doe I and the claims against John Does II and III are dismissed.

### C. *Cook and Armenakis*

■ Defendant Cook is the Director of ODOC. Defendant Armenakis, ODOC's Assistant Director–Institutions, oversees the superintendents of all correctional facilities within the State of Oregon as well as a variety of other ODOC facilities and units. Armenakis also recommends and drafts ODOC administrative rules and procedures. The Complaint alleges that Giba wrote a letter to Cook requesting that the disciplinary findings be expunged because they were a result of staff malfeasance and retaliation. Armenakis answered Giba's letter six months later, refusing to intervene.

There is no evidence that Cook or Armenakis directly participated in or played an affirmative part in the § 1983 violations alleged in the Complaint or that they demonstrated culpable action in their supervision of subordinates, acquiesced in Giba's alleged constitutional deprivations, or showed reckless indifference to Giba's constitutional rights. Accordingly, the claims

against Cook and Armenakis are dismissed.

### D. *Remaining Defendants*

When reviewing the facts as favorably as possible to Giba, the evidence of personal participation by many of the remaining defendants remains tenuous. However, as is required for *pro se* litigants, this court will give Giba the benefit of that doubt and assume that the remaining defendants personally participated in the alleged constitutional violations. Giba's claims nevertheless fail, as discussed below.

## II. *Qualified Immunity*

█ Defendants assert that they are entitled to qualified immunity. A government official who performs discretionary functions is entitled to qualified immunity "unless the official's conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir.1993).

> In *Saucier v. Katz*, the Supreme Court clarified the two-step qualified immunity inquiry. To decide whether a defendant is protected by qualified immunity, a court must first determine whether, "[t]aken in the light most favorable to the party asserting injury, ... the facts alleged show the officer's conduct violated a constitutional right." If the plaintiff's factual allegations do add up to a violation of the plaintiff's federal rights, then the court must proceed to determine whether the right was "clearly established," *i.e.*, whether the contours of the right were already delineated with sufficient clarity to make a reasonable officer in the defendant's circumstances aware that what he was doing violated the right. In essence, at the first step, the inquiry is whether the facts alleged

constitute a violation of the plaintiff's rights. If they do, then, at the second step, the question is whether the defendant could nonetheless have reasonably but erroneously believed that his or her conduct did not violate the plaintiff's rights.

*Devereaux v. Abbey,* 263 F.3d 1070, 1074 (9th Cir.2001), quoting *Saucier v. Katz,* 533 U.S. 194, 201–02, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (internal citations omitted).

For ease of reference, defendants have classified Giba's 54 claims into the following nine categories: (1) due process (Complaint, ¶¶ 5.1, 5.13–.14, 5.16–.18, 5.20–.23, 5.25, 5.28–.30, 5.32, 5.37, 5.39, 5.53); (2) access to the courts (*id.*, ¶¶ 5.9–.10, 5.13, 5.15, 5.20–23, 5.35, 5.40), including a cover-up (*id.*, ¶¶ 5.6, 5.8, 5.36); (3) Eighth Amendment (*id.*, ¶¶ 5.19, 5.31–.34, 5.38, 5.41, 5.43–.44, 5.52–.53); (4) Fourth Amendment (*id.*, ¶¶ 5.7, 5.9, 5.14–.15, 5.21, 5.48–.50); (5) Sixth Amendment (*id.*, ¶¶ 5.3–.5, 5.7–.10, 5.13, 5.15, 5.20–.23, 5.35, 5.40, 5.48–.49); (6) First Amendment (*id.*, ¶¶ 5.2, 5.4–.5, 5.7–.10, 5.13, 5.15, 5.20–.23, 5.35, 5.38, 5.40, 5.45–.46, 5.49–.50; (7)) conspiracy; (8) retaliation (*id.*, ¶¶ 5.11, 5.19, 5.42–.44); and (9) equal protection (*id.*, ¶¶ 5.43–.44).[7] Because Giba does not contest this classification of his claims, this court adopts it for purposes of its analysis.

### A. *Due Process*

Giba's alleged due process violations may be divided into the following five subcategories: (1) disciplinary misconduct proceedings; (2) failure to respond; (3) unprocessed grievances; (4) classification; and (5) miscellaneous. Each subcategory is discussed separately.

---

**7.** Not all numbered paragraphs in the Complaint are included in this list. However, the omitted paragraphs do not allege any cognizable claim.

**1182**

### 1. *Disciplinary Misconduct Proceedings*

Giba alleges that he was denied due process by every person involved from initiation of his disciplinary charges through appeal, including the two separate misconduct hearings.

### a. *Contraband III Violation*

■ Giba's misconduct violation for Contraband III is a *minor* violation resulting from possession of legal materials belonging to another inmate. Myers sanctioned Giba to seven days Loss of Privileges. Giba argues that this sanction was unwarranted since he had no reason to know that the rule prohibited him from possessing copies, as opposed to originals, of another inmate's legal materials.

This court is unwilling to make a distinction between originals and copies of legal materials. The regulation itself makes no such distinction, but instead broadly prohibits the possession of "legal materials belonging to another inmate." OAR 291–105–0015(1)(f). It is not within the province of this court to overturn a reasonable interpretation of a state agency's rule, particularly since federal courts should avoid " 'unnecessar[y] ... involvement ... in affairs of prison administration.' " *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), quoting *Procunier v. Martinez*, 416 U.S. 396, 407, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

■ Moreover, the allegations relating to this particular disciplinary misconduct proceeding are not actionable. A due process claim must be premised on the denial of a protected liberty interest requiring a prisoner to allege that he was subjected to an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (finding that 30 days in prison segregation unit does not implicate a liberty interest). .

The sanction of seven days of Loss of Privileges did not subject Giba to an atypical and significant hardship. Accordingly, defendants are entitled to summary judgment.

### b. *Disobedience of an Order II*

Giba's violation of Disobedience of an Order II is a major violation resulting in a seven day stay in Disciplinary Segregation and 14 days Loss of Privileges. Defendants concede that there is some difficulty in justifying the Disobedience of an Order II charge. An Order is "[a]ny direction given to an inmate which directs or forbids the doing of some act over which the inmate has control [and] may be written, verbal or [a] gestured communication, including all [ODOC] functional unit rules and procedures." OAR 291–105–0010(26). Giba was not ordered to do anything, so he could not have disobeyed an order.

If anything, Giba's letter to inmate Cunningham requesting that he send an affidavit to Giba's attorney-sister violated the Mail Rule.[8] As Myers explained at the hearing, Giba was attempting to circumvent the Mail Rule by disguising his incoming mail as legal mail so that ODOC officials would not review it. Even though Giba did not violate an order, he did violate a rule. Accordingly, Giba's letter to Cunningham should have either been returned to Giba with a Mail Violation Notice or "confiscated and retained for the hearings officer" with a "Misconduct Report" if it "pose[d] a threat or detriment to the security, good order, and/or discipline of the facility, or would encourage or in-

---

**8.** OAR 291–131–020(4)(c) provides that: "Inmates shall not request another inmate to forward correspondence beyond the immediate addressee." Moreover, OAR 291–131–025(8) provides that: "Legal and official mail received directly from the original source shall be authorized up to three inches thick."

struct in criminal activity ...." OAR 291–131–037(2)(c).

 Even though no basis exists for charging Giba with Disobedience of an Order II, due process is not implicated. A disciplinary sanction of seven days in a prison segregation unit does not raise a protected federal or state liberty interest directly under the due process clause. *Sandin*, 515 U.S. at 486, 115 S.Ct. 2293. Accordingly, this claim is dismissed.

### 2. *Failure to Respond*

Giba complains that various officials occasionally failed to respond and sometimes responded inaccurately to letters from him and from his attorney-sister. Now Giba concedes that no protected liberty or property interest is implicated. However, he maintains that this is an part of his conspiracy claim, which is discussed below (section G). Accordingly, this due process claim is dismissed.

### 3. *Unprocessed Grievances*

 Giba next alleges that his due process rights were violated when defendants Stuart and Ryals returned unprocessed his grievances concerning these disciplinary violations. Giba now concedes that *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir.1988) forecloses this claim because an inmate has no due process rights arising out of a prison grievance procedure. However, Giba maintains that this forms part of his conspiracy claim, as discussed below (section G). Accordingly, this due process claim is dismissed.

### 4. *Classification*

 Giba asserts that he was denied due process when defendant Blankenbaker "instigat[ed] the two Misconduct Reports ... in order to prevent him from obtaining minimum custody status and transfer to a minimum custody prison." Complaint, ¶ 4.111. Now Giba concedes that in light

of *Moody v. Daggett,* 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), a prisoner has no constitutional right to a particular classification status and it is unnecessary for this court to compare the difference between the segregation units found in a medium and minimum security prison. *See Id.; Hernandez v. Johnston,* 833 F.2d 1316, 1318 (9th Cir.1987).

Giba also urges that he would have been reclassified and transferred to a minimum custody prison but for these unwarranted disciplinary charges. This classification claim is unfounded. The disciplinary charges affected only his Institutional Risk score, which had to be 52 or less to qualify for minimum custody. Giba's Institutional Risk score dropped from 61 on May 22, 1997, to 58 on December 5, 1997, and then to 39 on May 8, 1998. After the misconduct charges arising out of the November 21, 1997 incidents, Giba's Institutional Risk score dropped three points, but was still six points above the 52 point cutoff. Nothing in the record indicates that this score would have dropped to 52 or less on December 5, 1997, had he not been charged with Disobedience of an Order II. In fact, the record reveals quite the opposite. The three point drop was due to a decrease in "recent misconduct severity" from "moderate/high without major concern" to "low."

Even though Defendants do not provide any evidence as to whether Giba's violation of the Mail Rule is a major or minor infraction, it has no impact on this court's conclusion. The elimination of this sanction might have reduced his Institutional Risk score, but that score actually decreased after the Misconduct Reports and was finally low enough on May 8, 1998, when he qualified for minimum custody status due to a rating of "one or less" in "institutional misconduct" and "no misconduct past 12 months" in his "recent misconduct severity." Instead, it was Giba's

Public Risk score increase, from 83 to 112, that prevented him from obtaining minimum custody status. This increase was due to the time remaining on Giba's sentence which changed from "less than 13" to "37 or more months." Giba does not challenge this change in his sentence duration, yet this is what ultimately prevented him from qualifying for minimum custody. Accordingly, this claim is dismissed.

## 5. *Miscellaneous*

Lastly, Giba asserts due process violations in an array of other contexts, including: (1) defendant Myers' threatening behavior at the disciplinary hearing; (2) the confiscation of legal documents; (3) a mandatory cognitive restructuring class; (4) a new job assignment; and (5) parole board bias. For the reasons that follow, these miscellaneous due process claims are dismissed.

### a. *Threat at Disciplinary Hearing*

■ Giba claims that he was denied due process when defendant Myers asserted in a "challenging tone" that he was going to have the confiscated legal documents destroyed and that Giba could have obtained these documents through discovery in his own suit. "But [he] can't just take [th]em from another inmate and copy [th]em." Myers Aff, attach 1, p. 9. Myers' alleged threatening tone in and of itself does not implicate due process. Moreover, Myers' "threat" seems only to rephrase a legitimate prison rule, namely that prisoners may only have legal documents pertaining to and obtained as a result of their *own* lawsuits. There is no evidence that Giba's access to the courts has been unconstitutionally hampered. To the contrary, Giba has provided to this court many documents which relate to this particular lawsuit.

### b. *Confiscation of Legal Documents*

Next, Giba argues that defendant Snyder's confiscation and destruction of copies of another inmate's legal materials amounts to a denial of due process because these documents related to a separate lawsuit that was ultimately dismissed. This claim is without merit because it is difficult to perceive how the confiscation and destruction of these documents had any impact on his separate lawsuit. He could have obtained the same documents through the normal discovery process in his own lawsuit.

■ Moreover, this cause of action fails because "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Giba had an adequate state remedy under Oregon law available against officials, such as defendants Snyder and Myers, to redress the alleged confiscation by means of an action in small claims court or an action for conversion. *See* ORS 46.405 *et seq.;* ORS 30.260 *et seq.* Giba claims that this remedy is difficult to obtain from prison. Nevertheless, such a remedy is legally available.

Lastly, defendant Myers charged Giba with possessing the legal materials of another inmate. These materials constituted contraband which, as defined by prison rules, is properly subject to confiscation.

### c. *Mandatory Cognitive Restructuring Class*

Giba asserts that he was denied due process when defendant Blankenbaker required that he attend cognitive restructuring classes. Giba now concedes that the claim is more appropriately part of his

retaliation claim, discussed below (section H).

#### d. *New Job Assignment*

■ Giba asserts that he was denied due process when he was fired from his job and reassigned to a more onerous and less lucrative position and that he had a liberty and property interest in the pay he received in his former position. However, "[a]n inmate's expectation of keeping a certain prison job does not amount to a property or liberty interest entitled to protection under the due process clause." *Gibson v. McEvers*, 631 F.2d 95, 98 (1980); *see also Baumann v, Arizona Dep't of Corr.*, 754 F.2d 841, 844 (9th Cir.1985). Accordingly, as Giba concedes, he has no due process right to a particular prison job.

#### e. *Parole Board Bias*

Lastly, Giba alleges a liberty interest in proceeding before an impartial parole board. Defendants dispute the relevance of this allegation since Giba provides no evidence that members of the parole board were biased when considering these disciplinary violations in relation to his parole release. This court agrees.

### B. *Access to the Courts*

Giba claims that several defendants denied him the right of access to the courts and that he incurred an actual injury because the "confiscated documents eventually culminated in plaintiff having his lawsuit dismissed."

■ To state a claim for denial of the Fourteenth Amendment right of access to the courts where the adequacy of law libraries or legal assistance is not involved, a prisoner must allege "actual injury," defined as "some specific 'instance in which an inmate was actually denied access to the courts.'" *Sands v. Lewis*, 886 F.2d 1166, 1171 (9th Cir.1989), quoting *Peterkin v. Jeffes*, 855 F.2d 1021, 1041–42 (3rd Cir. 1988).

■ Here, Giba alleges that he was denied the right of access to the courts because several defendants confiscated and destroyed his photocopies of another inmate's legal papers. Giba, however, fails to show how this interference actually caused the dismissal of his civil case, let alone to which civil case he is referring. Moreover, Giba should have been able to procure any documents relating to his own case through the discovery process and by requesting affidavits from other inmates to be sent directly to him. Thus, the confiscation and destruction of these papers cannot amount to the denial of court access.

The Complaint also alleges a denial of court access under a coverup theory regarding the interception of Giba's letter to inmate Cunningham and ODOC's subsequent refusal to allow Cunningham to send Giba an affidavit stating that defendant Carney had violated his constitutional rights by reviewing his legal mail. Giba now alleges that he has a cause of action for coverup against those defendants who "shield[ed] him from garnering testimonial evidence in the form of an affidavit from inmate Cunningham."

■ Giba misunderstands a coverup cause of action. A coverup may be actionable as a denial of the right of access to courts when state officials shield facts that, if known, would have resulted in a successful lawsuit. *See Karim–Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 625 (9th Cir.1988) (holding that a coverup Fourth Amendment violation is actionable upon a showing that defendants obstructed justice). No facts were shielded by any defendant. Giba was well-aware of the facts pertaining to his lawsuit. In fact, he possessed legal materials of another inmate and was trying to obtain information in an affidavit from another inmate. OAR

291–117–0020(2)(e) authorizes an inmate to possess "legal material in or directly pertaining to his/her own pending and active cases(s)/lawsuit(s) before the courts or paroling authorities . . . ." Defendants did not prevent Giba from knowing information about his own lawsuits and did not try to hide a known fact from him. Accordingly, this claim is dismissed.

### C. *Eighth Amendment*

Next, Giba asserts claims for cruel and unusual punishment in violation of the Eighth Amendment. " 'An Eighth Amendment claim that a prison official has deprived inmates of humane conditions must meet two requirements, one objective and one subjective.' " *Lopez v. Smith,* 203 F.3d 1122, 1132 (9th Cir.2000), quoting *Allen v. Sakai,* 48 F.3d 1082, 1087 (9th Cir. 1995). "Under the objective requirement, the prison official's acts or omissions must deprive an inmate of the minimal civilized measure of life's necessities. The subjective requirement, relating to the defendant's state of mind, requires deliberate indifference." *Lopez,* 203 F.3d at 1133, quoting *Allen,* 48 F.3d at 1087–88. Furthermore, a prisoner's § 1983 claim on an alleged Eighth Amendment violation requires an "actual injury." *Lewis v. Casey,* 518 U.S. 343, 351–52, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

■ Giba bases his Eighth Amendment claims on disciplinary sanctions, failure to respond to letters from him and his attorney-sister, the imposition of a course requirement, an unwarranted change in job assignment, disciplinary violations while working, and inaccurate accounting of his good-time credits. None of these conditions deprived him of humane conditions. Nor did he suffer any apparent actual injury as a result. Accordingly, defendants are entitled to summary judgment as to this claim.

### D. *Fourth Amendment*

■ Giba alleges several illegal search and seizure incidents in violation of the Fourth Amendment. It is well-settled that a state prisoner has no reasonable expectation of privacy in his cell and is not entitled to Fourth Amendment protection against unreasonable searches and seizures. *See Hudson,* 468 U.S. at 527–28, 104 S.Ct. 3194; *Nakao v. Rushen,* 766 F.2d 410, 412 (9th Cir.1985). Moreover, initiating disciplinary hearings, stating that legal documents would be destroyed, destroying said legal documents, withholding these documents to divest a right of appeal, refusing to process grievances, withholding information, and failing to monitor staff who might have read legal mail do not implicate the Fourth Amendment. Prison officials can seize contraband. Both Giba's letter to Cunningham and the legal documents of another inmate are properly characterized under ODOC's rules as contraband.

In support of his Fourth Amendment argument, Giba cites *Marquez v. Miranda,* 1993 WL 501494 (9th Cir.1993), an unpublished Ninth Circuit case. Even if Giba could properly cite to this unpublished case, it is not helpful since the plaintiff in that case did not allege a Fourth Amendment violation. Accordingly, this Fourth Amendment claim is dismissed.

The issue of whether a prison official can search and read legal materials outside of an inmate's presence is a different question that is more appropriately considered under the First Amendment, as discussed below (section F).

### E. *Sixth Amendment*

Giba asserts several Sixth Amendment violations relating to his right to counsel. He alleges that defendants interfered with his "right to privileged attorney-client communications when they intercepted,

opened, presumably read and possibly photocopied, as well as withheld [sic] from delivery both his incoming and outgoing clearly labeled [sic] 'legal mail.'" Giba misunderstands the Sixth Amendment.

■ "The Sixth Amendment right to counsel attaches only at the initiation of adversary criminal proceedings." *Davis v. United States,* 512 U.S. 452, 456–57, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). The Sixth Amendment does not apply to Giba's rights to privileged communications with a lawyer in a *civil* case. Here, the alleged communications relate only to civil cases.

Even if the Sixth Amendment applies, Giba's claim still fails because Hemphill, his attorney-sister, was not "actively representing" Giba in his civil cases when these misconduct violations were issued. "The fact that a person is a lawyer does not make all communications with that person privileged." *United States v. Martin,* Nos. 00–10443 and 00–10607, slip op. 4079 (9th Cir March 13, 2002), citing *United States v. Chen,* 99 F.3d 1495, 1501 (9th Cir.1996). Hemphill occasionally provided Giba with substantive and procedural advice on legal issues relating to his civil rights cases, but only represented Giba in "preparing for hearings before the Oregon State Board of Parole and Post–Prison Supervision" held in June 1998, June 1999, and September 1999. Thus, Hemphill intended to forward Cunningham's affidavit to Giba for his case involving the improper opening of legal mail as his sister, not as his attorney. Because the attorney-client privilege is not implicated, this claim is dismissed.

## F. *First Amendment*

■ "A prisoner retains those First Amendment rights that are 'not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" *Hargis v. Foster,* 282 F.3d 1154, 1157 (9th Cir.2002), quoting *Prison Legal News v. Cook,* 238 F.3d 1145, 1149 (9th Cir.2001). Prisoners have "a First Amendment right to send and receive mail." *Witherow v. Paff,* 52 F.3d 264, 265 (9th Cir.1995) (*per curiam*). However, "[a] prison may adopt regulations which infringe on an inmate's constitutional rights if those regulations are 'reasonably related to legitimate penological interests.'" *O'Keefe v. Van Boening,* 82 F.3d 322, 325 (9th Cir.1996), quoting *Turner,* 482 U.S. at 89, 107 S.Ct. 2254.

Four factors determine the reasonableness of a prison regulation: "(1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there exists an obvious, easy alternative to the regulation that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." *O'Keefe,* 82 F.3d at 325, quoting *Turner,* 482 U.S. at 89–91, 107 S.Ct. 2254 (internal quotations omitted).

Giba alleges that his First Amendment rights were violated in several respects, including his right to: (1) petition the government for a redress of grievances; (2) be present when his legal mail is opened and withheld; (3) free speech; and (4) be present when the confidential legal documents in his cell are searched and seized.

### 1. *Redress of Grievances*

■ Giba alleges that:
The actions of defendants in promulgating as well as enforcing rules prohibiting one inmate from possessing another inmate's legal materials, interpreting

plaintiff's possession of photocopies from originals of discovery documents and other legal documents with another ex-SRCI inmate's permission as a violation of that rule, and then punishing plaintiff for that (alleged) rule violation, constitutes a violation of plaintiff's rights to petition government for redress of grievances and of access to courts as provided for by the 1st ... Amendment[ ]. Complaint, ¶ 5.10.

The parties do not dispute that the "spirit or intent" of the rules prohibiting an inmate from possessing the legal materials of another inmate (OAR 291–117–0020(2)(e) and OAR 291–117–0060(5) [9]), which is to prevent inmates from operating as jailhouse lawyers for other inmates and to avoid bartering, extortion, violence, and an acquisition of power and control by those inmates who practice law. Instead, Giba argues that this rule should not apply to him because he had permission from the inmate to photocopy the confiscated documents for use in Giba's own lawsuit and because he was not acting as a jailhouse lawyer.

Though sympathetic to Giba's argument, this court is not inclined to require prison officials to draw distinctions between how and why an inmate comes into the possession of another inmate's legal materials. To hold otherwise places too great a burden on prison officials. An inmate's purpose and intent cannot be easily ascertained. If this court were to require such a distinction by prison officials, a proliferation of grievances would surely follow based on the inmate's purported purpose in possessing another inmate's legal materials. "[P]rison authorities have a legitimate penological interest in the consistent enforcement of prison rules ...." *Hargis,* 282 F.3d at 1157. There is no reason to create an exception to this objective standard. Neither an inmate nor a prison official should have to arbitrarily decide which legal materials are legitimate and which are not.

Giba clearly violated an ODOC rule when he obtained, photocopied, and retained the legal papers of another inmate, even if they were to be used in his own lawsuit. This rule is rationally related to a legitimate and neutral penological objective and goes no further than necessary to serve valid governmental interests of safety and security. Accordingly, defendants are entitled to summary judgment on this claim.

### 2. *Opening and Withholding of Legal Mail*

Giba alleges that his First Amendment right to private correspondence with Hemphill, his attorney-sister, was violated when John Doe II opened, read, possibly photocopied, withheld or failed to deliver his conspicuously labeled confidential legal mail. As previously discussed, John Doe II is dismissed and additional time for discovery is denied.

Moreover, Hemphill alleges that she only represented Giba during his disciplinary hearings in June 1998, June 1999, and September 1999. Hemphill asserts that she notified the parole board in June 1998 that she had received tampered mail and that it had a "chilling effect" on their confidential communications. However, it is impossible to know exactly when these alleged incidents occurred and if, in fact, Hemphill was acting in her capacity as a lawyer at the time the mail was intercepted. Importantly, Giba also admits that he litigated his claim of mailroom malfeasance

---

**9.** With the exception of religious items, OAR 291–117–0060(5) prohibits an inmate from giving, receiving, loaning, or otherwise transferring or exchanging property with another inmate.

and lost. Accordingly, this claim is dismissed.

### 3. *Free Speech*

■ Giba also alleges that intercepting his letter to another inmate requesting an affidavit interfered with his right to free expression. This court disagrees.

Courts are deferential when reviewing a prisoner's § 1983 claims falling within the First Amendment ambit. Prison officials have "broad discretion" in their right to monitor inmate correspondence and ensure that they are not "passing contraband" or "making clearly inappropriate comments, which 'may be expected to circulate among prisoners.'" *Shaw v. Murphy,* 532 U.S. 223, 231, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001), quoting *Thornburgh v. Abbott,* 490 U.S. 401, 412, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). While it was perfectly appropriate for Giba to ask Cunningham for an affidavit, this court cannot to make "valuations [on the] content" of his communication to Cunningham. *See Shaw,* 532 U.S. at 230, 121 S.Ct. 1475.

Two legitimate penological goals serve to justify ODOC's decision to intercept Giba's letter to Cunningham. First, prison officials should be shielded from hostile or abusive remarks. Second, prison officials have a legitimate interest to ensure that confidential legal mail is legitimate. Therefore, it is difficult to ascertain how Giba's First Amendment rights were implicated when he received a disciplinary violation concerning an intercepted letter (that Giba admittedly knew was going to be read by ODOC staff) which contained inappropriate sexual innuendos regarding two female prison officials and devised a plan to circumvent ODOC's interception of subsequent correspondence by abusing the status of legal mail.

Inmate-to-inmate mail communications with inappropriate comments and a scheme to pass nonlegal mail under the guise of legal materials is exactly what ODOC has a right to curtail. *See Turner,* 482 U.S. at 93, 107 S.Ct. 2254 (holding that a rule prohibiting inmate-to-inmate correspondence did not "unconstitutionally abridge the First Amendment rights of prison inmates" because it was "content neutral[,] ... logically advance[d] the goals of institutional security and safety identified by ... prison officials, and [was] not an exaggerated response to those objectives."). There are legitimate grounds to curtail derogatory communications regarding prison officials and the misuse of the legal mail system. Accordingly, this claim is dismissed.

### 4. *Cell Search*

■ Although Giba alleges a violation of the Fourth Amendment, the First Amendment is more appropriate to analyze his claim for defendant Snyder's search of his cell and seizure of contraband contained in a box clearly labeled "confidential—legal matters" while Giba was not present. Defendant Snyder did "not read any legal materials for content" when his "eye caught the names, telephone numbers and address of staff members" which raised "a security concern." Defendants argue that OAR 291–117–020(2)(e)(B)(ii) [10] permits such a "cursory review" of legal materials "to ensure compliance with ... [ODOC] rules." However, this rule is a subsection of the rule pertaining to "Ex-

---

**10.** OAR 291–117–0020(2)(e)(B)(ii) provides that: "If an inmate accumulates large amounts of authorized legal material which exceeds the designated storage container(s) and one standard storage box with interlocking flap, the following procedures will be utilized to provide for the inmate's access to and security of such materials: (ii) ... All materials shall be subject to a cursory review by employees to ensure compliance with these and other Department rules."

cess Authorized Legal Material" which is stored "in the facility law library and/or in such storage areas as designated by the functional unit manager." *Id.* at 020(2)(e)(B). This rule does not authorize a cursory review of legal materials an inmate possesses in his assigned housing area. Although it may perhaps be implied, defendants cite no express authority which authorized Snyder to review Giba's legal materials in his cell in his absence.

The Supreme Court has held that prison officials may open mail which is clearly marked "legal mail" and inspect it for contraband if the mail is opened in the presence of the inmate. *Wolff v. McDonnell,* 418 U.S. 539, 577, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The Court reasoned that the inmate's presence when the mail is opened and inspected ensures that prison officials will not read the mail, and thus censorship and confidentiality concerns are not implicated. *Id.* The Court, however, did not address whether reading an inmate's mail outside his presence would violate any constitutional right.

The Ninth Circuit has not directly addressed this issue under the First Amendment. However, under a due process clause analysis, it has held that the failure to permit an inmate to be present during an inspection of legal papers "is simply not a dramatic departure from the basic conditions of his incarceration [and] ... does not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Mitchell v. Dupnik,* 75 F.3d 517, 523 (9th Cir.1996) (internal quotations omitted). As another District Court explains:

> requiring the inmate's presence during a cell search takes away the element of surprise and randomness which makes searches so effective in ferreting out contraband. According to the Supreme Court: "Virtually the only place inmates can conceal weapons, drugs, and other contraband is in their cells. Unfettered access to these cells by prison officials, thus is imperative if drugs and contraband are to be ferreted out and sanitary surroundings are to be maintained."

*Schenck v. Edwards,* 921 F.Supp. 679, 690 (E.D.Wash.1996), *aff'd,* 133 F.3d 929 (9th Cir.1998), quoting *Hudson,* 468 U.S. at 527, 104 S.Ct. 3194.

This court is not inclined to find that the cell search in this case violated the First Amendment since Giba does not allege how he was injured by Snyder's scanning of documents and confiscating of contraband. Assuming that Snyder scanned all of Giba's documents, he confiscated only contraband, and not Giba's legitimate legal materials.

■ However, even if this cell search did violate the First Amendment, defendants are entitled to qualified immunity. As the court held in *Schenck:*

> At a minimum [the state actors] are entitled to qualified immunity from damages. The court is not aware of any clearly established law in this circuit which requires the inmate's presence during an inspection of the legal documents in his cell. One cannot legitimately extrapolate ... [from] incoming and outgoing grievance mail, and conclude that it amounts to clearly established law that an inmate's legal documents in his cell may only be inspected in his presence. Furthermore, a reasonable officer could believe that inspecting an inmate's legal documents outside his presence is lawful ....

*Id.* at 690 (internal citation omitted).

This court concurs with that analysis. Until the Ninth Circuit or the Supreme Court rules otherwise, a correctional officer is entitled to qualified immunity when scanning an inmate's confidential legal papers in his absence.

## G. *Conspiracy*

To state a conspiracy claim under § 1983, a plaintiff must state specific facts to support the existence of the claimed conspiracy and that there was " 'an agreement or meeting of the minds' to violate constitutional rights.' " *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 783–84 (9th Cir.2001), quoting *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41, 1543 (9th Cir.1989) (*en banc*). Despite his attempt to the contrary, Giba has failed to offer evidence to demonstrate a conspiracy, and it is difficult to fathom how these 21 named defendants and one John Doe orchestrated a collusive plan to violate Giba's constitutional rights. This is particularly true, given that defendant Myers agreed with Giba and lessened the first disciplinary charge to Contraband III, a minor violation, and Giba admitted that he knew that "there was a rule that an inmate's [sic] not allowed to give something to another inmate." Accordingly, this claim is dismissed.

## H. *Retaliation*

In order to prevail on a retaliation claim, plaintiff must allege and prove that defendants retaliated against him for exercising a constitutional right and that the retaliatory action did not advance legitimate penological goals or was not narrowly tailored to achieve such goals. *Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir.1997), *cert denied*, 524 U.S. 936, 118 S.Ct. 2339, 141 L.Ed.2d 711 (1998); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir.1995); *see also Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir.2000) (requiring injury). Moreover, a prisoner suing prison officials under § 1983 for retaliation for engaging in protected speech must allege "that the type of activity he engaged in was protected under the first amendment and that the state impermissibly infringed on this right to engage in the protected activity." *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir.1985).

Once the inmate meets this burden, prison officials must establish "by a preponderance of the evidence that they would have reached the same decision in the absence of the protected conduct." *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1315 (9th Cir.1989). Moreover, the court "should 'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Pratt*, 65 F.3d at 807, quoting *Sandin*, 515 U.S. at 482–83, 115 S.Ct. 2293.

Giba's retaliation claims stem from a separate lawsuit that he intended to file against prison officials regarding the unauthorized opening of his legal mail. He alleges that because he was preparing this separate lawsuit, defendants retaliated against him as demonstrated by the unwarranted sanctions, demeaning treatment when he used the bathrooms, and job demotion. For the reasons that follow, none of these allegations raise a genuine issue of material fact.

### 1. *Unwarranted Sanctions*

Giba fails to show how defendants used facially neutral prison rules in a retaliatory fashion to impose sanctions on him. Giba violated two prison rules, once when he wrote to inmate Cunningham asking him to send a confidential legal affidavit to his attorney-sister who would forward it to him, and once when legal materials of another inmate were found in his possession. Giba fails to show that defendants' acts leading to the filing of the misconduct report, the formal charges, and disciplinary proceedings do not advance a legitimate penological goal of enforcing these prison rules.

Defendants' motive for searching Giba's cell and finding the contraband may be suspect, but makes little difference because Giba violated prison rules. More-

over, Myers reduced Giba's violation to a minor infraction. Giba was erroneously charged with Disobedience of an Order II. However, this error does not amount to a constitutional violation since he suffered no cognizable injury and Myers advised Giba that he violated the Mail Rule. Myers' alleged threatening tone does not rise to retaliation relating to these misconduct hearings.

### 2. Unauthorized Bathroom Use

Giba alleges that defendant McCarron retaliated against him when he left his work area without authorization, attempted to bring a disciplinary charge, sent him to segregation, and made him sit on the floor and wait for Lieutenant Hardy to return him to his cell. This was the second time in a month that Lieutenant Hardy found that Giba had left his work area while under her supervision. Giba was not charged with a major violation and was not sent to segregation.

Giba fails to show an absence of a legitimate penological interest in McCarron's order to sit on the floor until the shift supervisor arrived. This is particularly so when a legitimate security concern arises upon the discovery that an inmate is missing from a designated work area. Lastly, the record does not include any evidence that defendant McCarron knew or had reason to know of Giba's impending lawsuit regarding the mailroom staff's alleged malfeasance.

### 3. Demeaning Job

Also in support of his retaliation claim, Giba alleges that he was not reinstated to the recycling crew after he served his disciplinary sanction for Disobedience of an Order II. He was advised that he was taken off the recycling crew for "security reasons" and was forced to take a much less desirable position with poor hours and less pay. The evidence clearly demonstrates that Giba did not pose any real

security risk and his disciplinary sanctions had nothing to do with his work assignment. Defendants' failure to cite to any legitimate reason for not reinstating Giba to the recycling crew raises an inference of retaliation.

However, Giba only alleges this claims against defendant Rodriguez. There is no evidence that Rodriguez knew about Giba's contemplated litigation alleging mailroom staff malfeasance. Additionally, Giba admits that Rodriguez did not make decisions about work assignments and knew nothing about Giba's new duty. Although this may be a viable claim for retaliation against the proper defendant, as discussed above, Giba's request for additional time to discover who did make this decision is denied. Therefore, this claim must be dismissed.

### I. Equal Protection

▉ Lastly, Giba alleges that defendant McCarron's treatment of him for using the bathroom twice without her authorization violated Giba's equal protection rights because "the same activity likely would have been overlooked had it been done by another inmate." Giba misunderstands the equal protection clause.

An equal protection claim requires that a plaintiff demonstrate by clear evidence that a defendant's acts "had a discriminatory effect and that it was motivated by a discriminatory purpose." *United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), quoting *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). Moreover, this claim must be based on "'an unjustifiable standard such as race, religion, or other arbitrary classifications' ... 'directed so exclusively against a particular class of person'... with a mind so unequal and oppressive that the system of prosecution amounts to a 'practical denial'

of equal protection of law." *Id.* at 464–65, 116 S.Ct. 1480, *quoting Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1963); *Yick Wo v. Hopkins,* 118 U.S. 356, 373, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

Giba does not allege that he is a member of any suspect class and cannot claim invidious treatment based on class characteristics. Thus, he has no equal protection claim based on selective prosecution and this claim is dismissed.

## III. *Declaratory and Injunctive Relief*

Qualified immunity bars claims for damages, but "does not bar an action for declaratory or prospective injunctive relief." *Fry v. Melaragno,* 939 F.2d 832, 839 (9th Cir.1991). Giba requests both declaratory and injunctive relief. However, he was transferred to a minimum security prison on January 15, 2002 (docket # 92), thus mooting the availability of declaratory or injunctive relief. Accordingly, these claims are dismissed.

## *ORDER*

For the reasons stated above, defendants' Motion for Summary Judgment (docket # 27) is granted and plaintiff's Motion to Compel (docket # 33) is denied as moot.